IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JERRY J. PAINADATH, | |
| *Plaintiff,* | CIVIL ACTION |
| v. | NO. 22-3604 |
| MELISSA LATTANZIO, et al., | |
| *Defendants.* | |

**Pappert, J.**                                                                                                    **April 26, 2024**

<u>MEMORANDUM</u>

  *Pro se* plaintiff Jerry Painadath's third amended complaint alleges numerous claims against his former employer, Good Shepherd Penn Partners, including violations of the Pennsylvania Older Adults Protective Services Act, Title VII of the Civil Rights Act and the Affordable Care Act.  Once again, GSPP moves to dismiss.  In December, the Court granted GSPP's motion to dismiss Painadath's second amended complaint in part and denied it in part.  Specifically, the Court denied GSPP's motion with respect to Painadath's claims under the OAPSA and ACA but granted it as to Painadath's Title VII claims because Painadath had alleged no facts showing he was discriminated against because of his sex or religion.  (ECF No. 51).  The Court granted Painadath leave to amend to include allegations of national origin discrimination and to cure the deficiencies identified in his previously asserted Title VII claims.  (*Id.*)

  Painadath's latest complaint is wide-ranging and contains many conclusory allegations.  Nonetheless, he alleges enough facts to raise a reasonable expectation that discovery will reveal proof of sex and national origin discrimination, and his disparate

1

treatment and hostile work environment claims based on those grounds survive. Painadath further alleges sufficient facts to state a disparate impact claim based on GSPP's alleged nepotism disparately impacting Catholics. But his Title VII disparate treatment and hostile work environment claims based on religious discrimination still suffer from the same, previously noted deficiencies, and they are now dismissed with prejudice.[1]

I[2]

Painadath worked as a "clinical nurse 2" at Philadelphia Post-Acute Partners, LLC d/b/a Good Shepherd Penn Partners. (Third Am. Compl. ¶ 48, ECF No. 52).[3] He is an Indian, Catholic man. (*Id.* ¶¶ 31–33). While working at GSPP, Painadath contends he reported multiple patient safety issues and concerns of staff members using excessive force or neglecting patients. (*Id.* ¶¶ 54–59, 76–77, 90–91). Painadath alleges that in retaliation for those reports, GSPP fired him in violation of the OAPSA and ACA. Painadath also contends he was discriminated against because of his sex,

---

[1] Painadath's OAPSA retaliation and ACA whistleblower claims survived GSPP's prior motion to dismiss for the reasons stated in the Court's previous opinion. *See* (ECF No. 50). Though GSPP moves to dismiss those claims again, the Court will not revisit them here. A defendant may not challenge the sufficiency of an amended complaint with arguments that were previously considered by the court in the first motion to dismiss. Nor may a defendant advance arguments that could have been made in the first motion to dismiss but did not do so. *See, e.g., United States Fidelity & Guar. Co. v. Jepsen*, No. 90-C-6931, 1991 U.S. Dist. LEXIS 16818, at *6–7 (N.D. Ill. Nov. 1, 1991).

[2] The Court provided a comprehensive factual summary, particularly regarding the OAPSA retaliation and ACA whistleblower claims, in a prior opinion. *See* (ECF No. 50). Here, it recounts only the facts necessary to resolve the present motion.

[3] All page numbers are referring to the ECF page number.

religion and national origin, and as a whole, GSPP's nepotism policy disparately impacted Catholics.

Most relevant here, Painadath complains of a string of incidents that he contends were discriminatory and resulted in a hostile work environment. In August 2021, Painadath notified a charge nurse that a CNA named Crystal used excessive force on an African American patient. Following the report, CNA Crystal apparently assaulted him and called him names like "nigga," "foreigners," and "crusades." (*Id.* ¶ 79). Painadath alleges a representative from the human resources department told him, "You came from India, so your [sic] a foreigner here . . . you came here to work . . . just do your work and go home" and "I was hired specifically to overkill you because you like to blow the whistle." (*Id.* ¶¶ 77–78). Painadath adds that he was "left with notice in an empty room for reporting the assault incident" and forced to take difficult assignments thereafter. (*Id.* ¶¶ 81–82).

On October 30, 2021, Painadath notified a clinical coordinator named "Mrs. Susan" of an older patient who was in a "neglected situation." (*Id.* ¶¶ 91, 94). Mrs. Susan allegedly told Painadath, "I will secure your job but you have to lie down for me" and then apparently did a "non-verbal gesture." (*Id.*) On November 1, 2021, Painadath gave an oral report to the local area of aging and notified GSPP through its "abuse coordinator grievance hotline." (*Id.* ¶ 97). Days later, Painadath was put on administrative leave without pay. (*Id.* ¶ 99). In the second week of November, Painadath's medical coverage was revoked. (*Id.* ¶ 101).

That same month, Painadath says he interviewed for an ICU nurse position at "HUP," which he contends was an "internal transfer position." (*Id.* ¶ 102). Before the

interview, Painadath alleges one of the interviewers collected his resume and gave him a different resume that she urged him to present during the interview. (*Id.* ¶ 102). Painadath did not get the job even though he says he was qualified for it. (*Id.*)

While suspended, Painadath notified GSPP that he was the head of his household and raising a family. In response, a GSPP administrator allegedly told him, "This is a continuation of everything that happened in that hospital . . . we wanted to spread fear among nurses for speaking up . . . we don't want to appreciated [sic] you . . . look for different career." (*Id.* ¶ 103). Painadath was fired on December 14, 2021. (*Id.* ¶ 108).

Painadath further alleges that GSPP employs a significant number of non-Catholics, and most belong to the same family, apparently in violation of GSPP policy. (*Id.* ¶ 36). According to Painadath, at least three other Catholics were previously fired, forced to resign or transferred to less desirable positions. (*Id.* ¶ 117). Painadath says that GSPP has not hired any Catholics since he was fired. (*Id.* ¶ 118).

II

To survive dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the facts pled "allow[ ] the court to draw the reasonable inference that [a] defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Where the well-pleaded facts do not permit the court to infer more than the mere possibility of

4

misconduct, the complaint has alleged, but not shown, that the pleader is entitled to relief. *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

When the complaint includes well-pleaded factual allegations, the Court "should assume their veracity and then determine whether they plausibly give rise to an entitlement of relief." *See Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 679). However, this "presumption of truth attaches only to those allegations for which there is sufficient factual matter to render them plausible on their face." *Schuchardt v. President of the U.S.*, 839 F.3d 336, 347 (3d Cir. 2016). This plausibility determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* (quoting *Connelly*, 809 F.3d at 786–87). Even if a party does not make a formal motion to dismiss, the Court may, on its own initiative, dismiss the complaint for failure to state a claim where the inadequacy of the complaint is apparent as a matter of law. *See, e.g., Zaslow v. Coleman*, 103 F. Supp.3d 657, 664 (E.D. Pa. May 5, 2015).

### III

A *prima facie* case for disparate treatment requires a plaintiff to show: (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination.[4] *Makky v. Chertoff*, 541

---

[4] GSPP interpreted Painadath's third amended complaint to assert disparate treatment claims based on sex, religion and national origin. *See* (Mot. To Dismiss, ECF No. 53-2, at 14–18). Construing Painadath's *pro se* complaint liberally, the Court does as well.

A Title VII religious discrimination claim could also proceed under a failure to accommodate theory. *Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 281 (3d Cir. 2001).

5

F.3d 205, 214 (3d Cir. 2008). At the motion to dismiss stage, however, a plaintiff need only allege enough facts to raise a reasonable expectation that discovery will reveal proof of his claims.[5] *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 789 (3d Cir. 2016). Painadath alleges GSPP took multiple adverse actions against him, including suspending him without pay, revoking his medical coverage and firing him. (Third Am. Compl. ¶¶ 99, 101, 108). Thus, his claims hinge on whether any of these adverse actions occurred under circumstances that give rise to an inference of discrimination.

---

Painadath does not appear to proceed under this theory, and in any event, he does not allege facts supporting such a claim.

[5]   GSPP contends that Painadath's Title VII claims are time-barred and equitable tolling does not apply. (Mot. To Dismiss, ECF No. 53-2, at 21). Painadath alleges that he never received the right to sue letter—and first saw it when GSPP attached it to a prior motion to dismiss—because the EEOC mailed it to his old address. Paindath says he notified the EEOC of his new address. (Third Am. Compl. ¶ 27). As alleged, Painadath's claims may be subject to equitable tolling. *See Baur v. Crum,* 882 F. Supp.2d 785, 799 (E.D. Pa. 2012) (finding that equitable tolling applied to situation where the EEOC sent the right to sue letter to the plaintiff's previous address even though the plaintiff had informed the EEOC of the new address). GSPP argues that even if the EEOC mailed the right to sue letter to the wrong address, equitable tolling should not apply because Painadath received his right to sue letter by email on October 31, 2022. (Mot. To Dismiss, ECF No. 53-2, at 22). In support of this assertion, GSPP urges the Court to take judicial notice of the EEOC's activity log, which allegedly indicates the EEOC electronically notified Painadath of his right to sue and he downloaded it within sixteen minutes of it becoming available. (*Id.*)

Other courts asked to take judicial notice of an EEOC activity log at the motion to dismiss stage have declined to do so. *See, e.g, Singh v. Infotech Prism, LLC*, No. 23-2250, 2023 U.S. Dist. LEXIS 227803, at *18–19 (N. Ga. Dec. 21, 2023); *Carrigan v. Archdiocese of Milwaukee*, No. 22-1084, 2023 U.S. Dist. LEXIS 185138, 2023 WL 6810073, at *3–4 (E.D. Wis. Oct. 16, 2023). This Court will not, either, because considering the activity log would require the Court to make "certain assumptions or inferences about what the various timestamps, acronyms, and terminology represent." *Singh*, 2023 U.S. Dist. LEXIS 227803, at *18. GSPP may renew this argument at summary judgment.

Relatedly, Painadath moves under Federal Rule of Civil Procedure Rule 12(f) to strike the activity log as inadmissible hearsay. (ECF No. 54). Because the Court is not considering the activity log at this time, Painadath's motion is denied as moot. In any event, motions to strike exhibits attached to a defendant's motion to dismiss are procedurally improper. *See In re Amarin Corp. PLC Sec. Litig.*, No. 19-6601, 2021 WL 1171669, at *6 (D.N.J. Mar. 29, 2021). Federal Rule of Civil Procedure 12(f) provides: "[t]he court may strike from a *pleading* an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." *Id.* (quoting Fed. R. Civ. P. 12(f)). An attachment to a motion is not a pleading.

6

Painadath alleges enough facts to "nudge" his disparate treatment claims based on sex or national origin discrimination "across the line from conceivable to plausible." *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008). As to sex discrimination, Painadath alleges that Mrs. Susan subjected him to an unwanted sexual advance when she gave him a non-verbal gesture and said, "I will secure your job but you have to lie down for me." (*Id.* ¶ 91); (Resp. To Mot. To Dismiss, ECF No. 55, at 5). He apparently refused, and days later, was placed on administrative leave without pay. (Third Am. Compl. ¶ 99). Weeks later, his medical benefits were revoked; a month after that, he was fired. (*Id.* ¶¶ 101, 108). As to national origin discrimination, Painadath contends that the HR department told him, "You come from India, so your [sic] foreigner here . . . you came here to work . . . just do your work and go home." (*Id.* ¶ 77). He says that CNA Crystal "assaulted" him and called him, among other names, a foreigner.[6] (*Id.* ¶ 79). He further adds his national origin was the reason he was "left with a notice in an empty room for reporting the assault incident," (*Id.* ¶ 81), and not offered an internal transfer position at HUP despite claiming to be qualified for it.[7] (*Id.* ¶ 102). Discovery may reveal a different result, but for now, Painadath's sex and national origin discrimination claims survive. (*Id.* ¶¶ 101, 108).

However, his disparate treatment claim based on religious discrimination fails. Though Painadath contends that GSPP previously fired or transferred to less desirable positions three other Catholics, and that since he was fired, did not hire any Catholics,

---

[6] The Court does not consider "nigga" or "crusades" to implicate Painadath's Indian heritage.

[7] Without additional facts, it is unknown if the denial of the transfer was also an adverse employment action.

7

(*Id.* ¶¶ 117–18), he does not elaborate on those employment decisions or include allegations that similarly situated comparators were treated more favorably. *See, e.g., Golod v. Bank of Am. Corp.*, 403 F. App'x 699, 703 (3d Cir. 2010) (emphasizing that conclusory allegations of discrimination based on religion are not adequate to successfully support a claim because they do not include specific facts that show nonmembers of the protected class are treated more favorably). Moreover, Painadath fails to allege facts indicating GSPP was aware of his religion, and to state a claim for religious discrimination, "employees [must have] informed their employers of their religious beliefs prior to the alleged discriminatory action" because an "employee's religion . . . is often unknown to the employer." *Darby v. Temple University*, 216 F. Supp.3d 535, 542 (E.D. Pa. 2016).

IV

Painadath also alleges a disparate impact claim, though he does not assert it in a specific count. (Third Am. Compl. ¶ 36). A disparate impact claim under Title VII arises when an employer is shown to have used a specific employment practice, neutral on its face, but caused a substantial adverse impact on a protected group which cannot be justified as serving a legitimate business goal. *NAACP v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 476 (3d Cir. 2011). "Unlike the disparate treatment theory of liability, a claim for disparate impact does not require proof of discriminatory motive." *Crawford v. Verizon Pa., Inc.*, 103 F. Supp.3d 597, 606 (E.D. Pa. 2015). At the motion to dismiss stage, a plaintiff need only "plead that a facially neutral practice's adverse effects fall disproportionately" on a protected class. *Houle v. Walmart, Inc.*, 447 F. Supp.3d 261, 279 (M.D. Pa. 2020).

"[N]epotism, if it were proved to exist, could . . . be subject to challenge if it had a disparate impact on minorities." *Wards Cove Packing Co., Inc. v. Atonio,* 490 U.S. 642, 655 n.9 (1989). Here, Painadath contends "GSPP employs a significant number of 'Non Catholic' and most of them belongs to a same family even though GSPP policy clearly restrict employment of family member under same manager." (Third Am. Compl. ¶ 36). Painadath adds that GSPP has fired, transferred, or forced to resign "at least three" Catholics, and has not hired any Catholics since he was fired. (*Id.* ¶¶ 117–18). Drawing all reasonable inferences in his favor, Painadath has stated a disparate impact claim. *See United States v. Pennsylvania*, 100 F. Supp.3d 544, 553 (M.D. Pa. 2015); *Hagan v. City of New York*, 39 F. Supp.3d 481, 499 (S.D.N.Y. 2014); *Rodriguez v. Town of Ramapo*, 412 F. Supp.3d 412, 439–40 (S.D.N.Y. 2019).

V

A

Painadath also asserts hostile work environment claims.[8] GSPP contends that Painadath fails to allege facts supporting a hostile work environment claim based on sex or religion because nothing in his complaint indicates he faced intentional discrimination because he is a Catholic man. GSPP further contends Painadath failed to plead facts supporting a hostile work environment claim based on national origin discrimination because Painadath did not allege *respondeat superior* liability, nor can

---

[8] The third amended complaint only explicitly alleges a hostile work environment claim based on sex discrimination. However, the Court (and GSPP) construe his *pro se* complaint to also allege a hostile work environment claim based on religion and national origin discrimination. *See* (Mot. To Dismiss, ECF No. 53-2, at 27–31). However, for the reasons states *supra* Section III, Painadath did not allege any facts showing he was intentionally discriminated against because he is Catholic, and thus cannot maintain a hostile work environment claim based on his religion.

9

the alleged "foreigner" comments constitute "severe or pervasive" conduct. (Mot. To Dismiss, ECF No. 53-2, at 28–30).

B

To succeed on a hostile work environment claim, a plaintiff must establish: (1) he suffered intentional discrimination; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected him; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) the existence of *respondeat superior* liability. *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013).

C

Construed liberally, Painadath pleads a hostile work environment sexual harassment claim. Painadath alleges that Mrs. Susan made a sexual advance on him by giving him a non-verbal gesture and telling him she would "secure [his] job but [he] would have to lie down for [her]." As such, Paindath has pled facts indicating he was harassed "because of his sex." *Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 213 (3d Cir. 2017) (comments about the plaintiff's body establish that harassment occurred because of his sex). Painadath also alleges he was detrimentally affected by his work environment, as he was stressed, his relationships with loved ones soured and he stopped watching sports and exercising. (*Id.* ¶¶ 121–23). A reasonable person could also find an unwanted sexual advance by a supervisor to be humiliating or offensive. Painadath further alleges Mrs. Susan was a supervisor, thus pleading the existence of *respondeat superior* liability. *See In Re Tribune Media Co.*, 902 F.3d 384, 399 (3d Cir.

10

2018). And though the bar for establishing "severe or pervasive" conduct is high, "[c]ourts in this Circuit have . . . 'shown a reluctance to dismiss a complaint at the 12(b)(6) stage when the primary challenge to the hostile work environment claim is whether or not the conduct in question is severe [or] pervasive.'" *Fedder v. Bloomsburg Univ. of Pennsylvania*, No. 23-1678, 2024 WL 580552, at *3 (M.D. Pa. Feb. 13, 2024) (collecting cases). The question of whether allegations in a complaint are ultimately sufficient to prove that the racially harassing discrimination was severe or pervasive is a question best saved for summary judgment.⁹ *See, e.g., Robinson v. Amtrak*, 880 F. Supp.2d 575, 582 (E.D. Pa. 2012).

Painadath's apparent, purported hostile work environment claim based on national origin discrimination also survives for now. As noted *supra* Section III, Painadath alleges enough facts to raise a reasonable expectation that discovery will reveal proof of national origin discrimination. Painadath also alleges he was detrimentally affected insofar as the stress affected not only his ability to care for patients, but his life outside of work. (*Id.* ¶¶ 120–23). Liberally construed, he also alleges *respondeat superior* liability because he contends "GSPP failed to take proper steps" in response to the purported comments he faced. (*Id.* ¶ 80). And again, while

---

⁹  Unwanted sexual advances can also constitute a *quid pro quo* sexual harassment claim. *See Tomkins v. Pub. Serv. Elec. & Gas Co.,* 568 F.2d 1044, 1048-49 (3d Cir. 1977). Such unwelcome requests can constitute *quid pro quo* harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment [or] (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual. *Cherisme v. Aids Care Grp.*, No. 15-6420, 2016 U.S. Dist. LEXIS 97118, at *6 (E.D. Pa. July 26, 2016) (quoting *Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 28 (3d Cir. 1997)). Although Painadath does not directly proceed under this theory, he does allege that Mrs. Susan, apparently a supervisor, told him she would "secure [his] job" and then allegedly made a sexual advance. (Third Am Comp. ¶ 91). Painadath seemingly refused, and days later, was placed on administrative leave. (*Id.* ¶ 99).

GSPP contends that the comments were neither sufficiently severe nor pervasive, that question is better addressed at summary judgment. *See Fedder*, 2024 WL 580552, at *3.

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.