**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JERRY J. PAINADATH, | |
| *Plaintiff,* | CIVIL ACTION |
| v. | NO. 22-3604 |
| GOOD SHEPHERD PENN PARTNERS, | |
| *Defendant.* | |

**Pappert, J.**                                                    **November 4, 2024**

## <u>MEMORANDUM</u>

Discovery disputes, like cockroaches, are unpleasant but must be dealt with. This case features both. The Court tackles here the former but leaves the latter to the professionals.

On September 6, 2022, *pro se* plaintiff Jerry Painadath filed this lawsuit against his former employer, Good Shepherd Penn Partners ("GSPP"), and several of its employees. Painadath amended his complaint three times and after multiple rounds of motions to dismiss and a motion to strike, only GSPP remains as a defendant. GSPP raised, among other things, in those motions an issue central to the case's discovery battles. Specifically, GSPP, relying on EEOC documents, claimed that Painadath downloaded onto one of his electronic devices the EEOC's Notice of Right to Sue ("NRTS") on October 31, 2022, more than ninety days before he asserted in federal court his claims under Title VII, rendering those claims untimely. The Court declined to dismiss the claims as time-barred, though it did dismiss some of them for failing to state a claim.

But the motions shined a bright light on an extremely important issue — exactly when Painadath first knew he could pursue his Title VII claims in court. GSPP zeroed in on that issue as soon as discovery began. And Painadath immediately embarked on his campaign to prevent GSPP from finding out what happened. He willfully hid the ball and delayed, obfuscated and hindered GSPP at every turn. GSPP did all it reasonably could to get Painadath to cooperate. When those efforts failed, it sought the Court's intervention, and the Court overruled Painadath's objections, criticized his tactics and ordered him to comply. But he kept it up, going so far as to delete relevant information from his iPhone before allowing GSPP to inspect it, as the Court required. And he failed to preserve evidence on his laptop (so much so that a cockroach took up residence inside it) despite knowing he had to do so.

GSPP moved for sanctions. Painadath responded and the Court held a hearing which included Painadath's testimony and that of a representative of the company GSPP retained to examine the devices. GSPP seeks an array of sanctions, but only one of them is appropriate under the particular facts and circumstances. For the reasons fully explained below, the Court grants GSPP's motion and orders established the fact that Painadath received the NRTS on October 31, 2022. This makes his Title VII claims untimely and they are dismissed with prejudice.

I

Painadath filed this lawsuit in September of 2022, initially alleging violations of the Occupational Safety and Health Administration and Affordable Care Acts. (Compl., ECF No. 1.) He amended his complaint and asserted, for the first time, claims under Title VII on February 13, 2023. (First Am. Compl., ECF No. 16.) In two motions to

dismiss and a motion to strike, GSPP raised a statute of limitations defense to the Title VII claims.  (ECF Nos. 21-1, 37-1, 40-1.)  In the motion to strike, GSPP relied on the EEOC Activity Log for Painadath's EEOC charge, which indicated that the EEOC online portal was accessed, and the NRTS downloaded, by someone using the charging party's account on October 31, 2022, shortly after the NRTS was issued.  (Def. Mot. to Strike at 5–6, ECF No. 40-1.)  GSPP renewed this argument in its motion to dismiss the third amended complaint (ECF No. 53-1), but the Court declined to rely on the Activity Log alone to dismiss claims at that stage and allowed the Title VII claims, as well as two others, to proceed to discovery, (Order, ECF No. 58).[1]

At the Rule 16 conference in June of 2024, the Court addressed several preliminary discovery concerns.  When asked to explain his statements about "privacy privilege" in the Rule 26(f) Report, Painadath expressed concerns about GSPP's requests, including the request for his social media posts about GSPP.  (Rule 16 Tr. at 12:8–10, ECF No. 84.)  The Court explained that GSPP was entitled to this information, as well as Painadath's medical records, and ordered him to provide the signed medical authorization GSPP had requested.  (*Id.* at 13:8–24, 21:3–22:21.)

Discovery did not get off to a good start.  Painadath cited, among other things, the Fifth Amendment and refused to respond to GSPP's interrogatories and document production requests.  (Def. Mot. for Sanctions, Ex. C at 39–42, ECF No. 73-4.)  And

---

[1]     Painadath filed a number of motions before the pleadings closed, including several related to an attempt to appeal the Court's order dismissing the first amended complaint but granting Painadath leave to amend.  *See* (Pl. Mot. for Protective Order, ECF No. 10; Pl. Pet. for Leave to Appeal, ECF No. 27; Pl. Mot. for Stay Pending Appeal, ECF No. 29; Pl. Mot. for Rule 54(b) Certification, ECF No. 32; Pl. Mot. to Strike Exhibit, ECF No. 44; Pl. Mot to Strike Exhibit, ECF No. 54.)

despite having been ordered to do so, he did not sign the authorization for the release of his medical records to GSPP.  (*Id.*, Ex. D at 44.)

After counsel sent him a detailed deficiency letter, (*id.* at 44–50), Painadath requested a meeting but declined to make himself available until four weeks later, (id., Ex. E at 52–55).  He also rescinded his agreement to produce devices for forensic inspection due to vague concerns about an AT&T data breach.  (*Id.*, Ex. E at 55–58 (abruptly reversing his agreement to produce devices and accusing counsel of "oppress[ive]" conduct)).  GSPP then turned to the Court for help, (ECF No. 69), and Painadath responded, (ECF No. 70).  The Court considered the parties' submissions and on July 30 overruled all of Painadath's objections and ordered him to "fully and completely respond" to GSPP's interrogatories, "produce all documents requested" by GSPP and "produce . . . the electronic devices he used to access the EEOC online portal" and his signed medical release authorization on or before August 19th.  (ECF No. 71) (hereinafter, the "Order.")  The Court also warned Painadath that failure to comply could result in sanctions.  (*Id.*)

Over the following two weeks, Painadath repeatedly ignored requests to affirmatively identify the devices he used.  (Def. Mot. for Sanctions, Ex. F at 68–72, ECF No. 73-4).  All Painadath would say was that he owned a MacBook and an iPhone in the relevant period.  (*Id.* at 72).

Confirming when Painadath would produce those devices for inspection by GSPP's vendor, TransPerfect, was needlessly difficult.  He first told counsel that he had a "tight schedule" after August 10th.  (*Id.*)  Counsel offered him three dates that fit his purported schedule, (*id.* at 71–72), so Painadath pivoted: now, without explanation, he

wanted a date between August 15th and 20th, (*id.* at 69–70).  Counsel accommodated

him again and scheduled an appointment for August 15th.  (*Id.* at 68.)  Counsel

informed Painadath that arriving before 10 a.m. would mean TransPerfect could likely

return his devices to him that day.  (*Id.* at 72.)  When Painadath later stated that he

would prefer to both arrive in the afternoon and have his devices returned the same

day, (*id.* at 65), counsel again informed him that this was not guaranteed, (*id.*).

Painadath then told counsel he would arrive between 10 a.m. and noon.  (*Id.* at 63.)[2]

Notably, he never once mentioned during these email exchanges that his MacBook

didn't work.[3]

Painadath arrived at TransPerfect sometime after noon on August 15th and gave

his MacBook and iPhone to TransPerfect's employees.  (Def. Reply in Supp. of Motion

for Sanctions, Ex. 2 at 26, ECF No. 79-2.)  Bruce Gillis Jr., a Senior Digital Forensic

---

[2]    Painadath twice attempted to place conditions on the inspection in the form of a limitation on search terms and a requirement that he be physically present.  The first time, on August 13th, he backed down after counsel reminded him there were no such conditions in the Order.  (*Id.* at 67–68.) The second time — late evening on August 14th and mere hours after confirming he would arrive the following day — he begrudgingly acquiesced after again being reminded of the Order.  (*Id.* at 82–83.)

[3]    Painadath claims that he told counsel about his broken laptop during the Rule 26(f) conference, (Pl. Resp. in Opp. to Mot. for Sanctions 12, ECF No. 76; Sanctions H'rg Tr. 51:9–18, ECF No. 81), which took place on May 28, 2024, (Joint Status Report 1, ECF No. 62).  There's no statement to that effect in the Report.  (*Id.*)  Counsel also has no recollection of this disclosure, and accurately points out its relevance, if any, wouldn't have been clear.  (Sanctions H'rg Tr. 51:22–13.)
        During the Rule 16 conference, Painadath did say — while trying to explain his request in the Report for a protective order covering "all electronic devices such as GSPP-affiliated apps" and "all electronic devices which reasonably believe compromised" — that he had a laptop that had been damaged in October of 2023 when US Bank began foreclosure proceedings and entered his home when he wasn't present.  (Rule 16 Tr. at 14:5–17:21.)  But a protective order shields information from disclosure, making his request difficult to understand.  Even when asked directly, he didn't explain how his story or request were relevant to the current litigation.  (*Id.* at 17:8–12.)  Nor could GSPP have known of its relevance at the time: its requests for production, sent on June 7, requested that he produce devices used to access the portal only if he denied ever downloading any documents from it.  (Def. Mot. for Sanctions, Ex. B at 29, ECF No. 73-4.)  Assuming that Painadath was attempting to tell counsel that a device relevant to the litigation had been compromised, counsel reasonably didn't understand Painadath's point at the time.

Examiner in TransPerfect's Forensic Technology and Consulting division who participated in the forensic inspection, (*id.* at 25; Sanctions H'rg Tr. at 16:20–23), testified at the sanctions hearing and described the day's events.  The inspection of the MacBook got off to an inauspicious start.  Painadath initially claimed not to have the password.  (Ex. 2 at 26.)  He subsequently came up with it, though not before a *cockroach* crawled out of one of the device's vents.  (*Id.* at 26–27.)  The laptop wouldn't power on.  (*Id.*)  And, ultimately, it never did: despite thirty minutes on a charger, the laptop proved deader than the cockroach.  (*Id.*; Sanctions H'rg Tr. 22:25–23:6.)  TransPerfect concluded it would be unable to collect any data from the device in its current state.  (Ex. 2 at 27; Sanctions H'rg Tr. at 20:12–17.)  Inspection of Painadath's iPhone was, at first, more promising.  It actually worked, and TransPerfect was able to determine that of the 256 GB of storage, 246 GB were in use.  (Ex. 2 at 27; Sanctions H'rg Tr. at 17:6–8.)  But the first attempted data collection failed, (Ex. 2 at 27; Sanctions H'rg Tr. at 17:8–9), and Painadath took his phone back before a second attempt could be completed, claiming to have an appointment four hours later that day.  (Ex. 2 at 28; Sanctions H'rg Tr. at 17:16–22.)  As a result, TransPerfect was prevented from completing the data collection or analyzing the data stored on the iPhone that day.  (Ex. 2 at 28; Sanctions H'rg Tr. at 17:23–18:2.)

When asked whether he would return with the phone, Painadath stalled.  First, he asked if there was another office he could go to.  (Ex. F at 102.)  Then, he asked GSPP to agree to extend the deadline to comply until August 25th.  (*Id.* at 101.)  Finally, Painadath said he would produce the phone on August 19th at 9 a.m., but insisted that the device be returned by 5 p.m.  (*Id.* at 100.)  When counsel responded

6

that TransPerfect would try to complete the inspection by that time but couldn't make any promises, Painadath stated that without that guarantee he wouldn't bring the phone back and would raise the issue with the Court.  (*Id.* at 99.)  The evening of August 18th, it was still unclear whether Painadath would appear.  (*Id.* at 97–98.)

Nonetheless, the following morning, Painadath called TransPerfect to say he would arrive with his iPhone that day at 1 p.m.  (Ex. 2 at 28.)  He didn't get there until 4:45.  (*Id.*)  And before beginning the collection, Gillis observed that only 215 of the available 256 GB of storage were in use, meaning more than 30 GB of data had been deleted from the phone since Painadath left with it on August 15th.  (*Id.* at 28–29; Sanctions H'rg Tr. 18:13–24.)  After completing the inspection of the reduced amount of data, TransPerfect was unable to conclude that the phone had accessed or downloaded anything from the EEOC's online portal.  (Ex. 2 at 30.)

## II

GSPP moves for sanctions under Federal Rules of Civil Procedure 37(b) and (e). The former authorizes a court to sanction a party who fails to obey a court order concerning discovery, and the latter authorizes sanctions for spoliation of electronically stored information (ESI).  Fed. R. Civ. P. 37(b), (e).

In considering GSPP's motion, the Court keeps in mind the purposes of Rule 37: to "(1) penalize the culpable party or attorney; (2) deter others from engaging in similar conduct; (3) compensate the court and other parties for the expense caused by the abusive conduct; and (4) compel discovery and disclosure."  *Wachtel v. Health Net, Inc.*, 239 F.R.D. 81, 99 (D.N.J. 2006).

III

A

Rule 37(b) authorizes a court to sanction a party who "fails to obey an order to provide or permit discovery."  Fed. R. Civ. P. 37(b)(2)(A).  In response to such failure, the court may "issue further just orders" as it sees fit, including an order "directing that . . . designated facts be taken as established for purposes of the action."  *Id.* 37(b)(2)(A)(i).  Upon finding a violation of Rule 37(b), the court "must order the disobedient party . . . to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust."  *Id.* 37(b)(2)(C).

B

The Court ordered Painadath to "produce . . . the electronic devices he used to access the EEOC online portal."  (Order at 2, ECF No. 71.)  Painadath fought this at every step.  To start, he never gave the defendant a straight answer on which devices were even at issue, despite knowing full well that this information was central to GSPP's discovery requests.  (*Id.* at 32:12–33:2; *see also* Ex. F. at 70–72 (repeated requests from counsel to identify devices).)  Even at the hearing, Painadath was evasive, muddying the water on which devices he possessed and used.  (Sanctions H'rg Tr. at 33:17–25; 34:24–36:3.)  After enough whack-a-mole with the Court, he stated that (1) he had used both the iPhone and the MacBook to access the portal, (*id.* at 47:8–9), and (2) he hadn't used any other devices for that purpose, (*id.* at 83:1–4).[4]

---

[4]    That's not to say he stopped trying to be cagey.  *See, e.g.,* (Sanctions H'rg Tr. 47:13–17.)

And Painadath may have eventually allowed GSPP to "examine" those devices — but that doesn't mean he complied with the Court's Order.  He deleted data from his iPhone before TransPerfect was able to image the device and he gave them a laptop he knew to be deader than a doornail, in addition to being a home for wayward roaches. *Cf. Reilly v. Home Depot U.S.A., Inc.*, 670 F. Supp. 3d 126, 141 (D.N.J. 2023) ("The integrity of the discovery process rests on the faithfulness of parties and counsel to the rules — both the spirit and the letter.") (citations omitted) (cleaned up).

Painadath knew what he was required to do.  (Sanctions H'rg Tr. at 33:8–16 (confirming he understood the Order); *id.* at 53 (explaining he knew about spoliation at the time of the Rule 16 Conference); Ex. F. at 70–72 (reminding Painadath that he was obligated to "truthfully identify" all devices used).)  And he knew that the purpose of imaging the devices was to determine whether he had accessed the portal on October 31, 2022 and downloaded the NRTS.  (Sanctions H'rg Tr. at 32:12–33:2; Ex. F. at 72.)

Tampering with his iPhone and belatedly turning over a laptop he knew (and had known for a long time) was inaccessible violated the Court's Order.

## IV

### A

Rule 37(e) governs the spoliation of ESI in federal court.  Under this rule, the court may impose sanctions where ESI "that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e).

Spoliation of ESI occurs when (1) the spoliating party was under a duty to preserve when the loss occurred, (2) the lost ESI was within the scope of the duty to preserve, (3) the party's failure to take reasonable steps to preserve the information caused its loss, and (4) the information is not recoverable elsewhere. *Bistrian v. Levi*, 448 F. Supp. 3d 454, 465 (E.D. Pa. 2020); *accord Domus BMW Funding, LLC v. Arch Ins. Co.*, No. 23-cv-94, 2024 WL 3761737, at *4 (E.D. Pa. Aug. 12, 2024).[5]

If the spoliation prejudiced another party, the court may impose sanctions "no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). But "only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation" may the court "presume that the lost information was unfavorable to the party," provide an adverse jury instruction, or dismiss the suit. *Id.* 37(e)(2). Thus, where a court finds prejudice, but not intent, it may not impose one of the sanctions authorized under Rule 37(e)(2). *See* Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment (cautioning courts to "ensure that curative measures under subdivision (e)(1) do not have the effect of measures that are permitted under subdivision (e)(2) only on a finding of intent").

---

[5]     The burden of proving spoliation, as well as what sanction should be imposed, is on the movant. *Carty v. Steem Monsters Corp.*, No. 20-cv-5585, 2022 WL 6184912, at *4 (E.D. Pa. Oct. 7, 2022). Whether this burden is by a preponderance of the evidence or clear and convincing evidence is unsettled. *Id.* at *4 n.9. Courts in this circuit often apply the preponderance standard. *See, e.g., Cianci v. Phoenixville Area Sch. Dist.*, No. 20-cv-4749, 2022 WL 824026, at *5 (E.D. Pa. March 18, 2022). Where the requested sanction is a default judgment, however, the clear and convincing standard may apply. *Compare CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 498-99 (S.D.N.Y. 2016) *with Friedman v. Philadelphia Parking Auth.*, No. 14-cv-6071, 2016 WL 6247470, at *6 (E.D. Pa. March 10, 2016) (explaining why the lower standard should apply at least where the movant doesn't ask for sanction that would end the case). The Court need not resolve that dispute here, as it finds that GSPP has carried its burden under either standard.

B

1

Painadath's duty to preserve relevant ESI began no later than February 13, 2023, when he first brought his Title VII claims in court.  (First Am. Compl., ECF No. 16.)  GSPP's motion to dismiss, filed on March 8, 2023, raised a statute of limitations defense to the Title VII claims and attached the NRTS as an exhibit.  (ECF Nos. 21-1, 21-11.)  Painadath knew, by that time at the very latest, that his communications with and any documents he could have received from the EEOC were crucial to the viability of those claims.  Painadath admitted using the EEOC portal during the last week of October of 2022 to upload documents, (Sanctions H'rg Tr. at 47:13–14), demonstrating that he knew the portal was a means of communicating with the EEOC.  And he testified that he accessed the portal by using his iPhone.  (*Id.* at 47:8–9.)  Moreover, he was specifically placed on notice of the importance of preserving information related to his accessing the portal and downloading documents from it no later than October 5th, 2023, the date on which GSPP attached the EEOC Activity Log in support of its argument that the Title VII claims were time-barred.  (ECF No. 40.)  Painadath was under a duty to preserve relevant ESI when he produced his iPhone for inspection on August 15th, 2024, and the ESI contained on his iPhone was squarely within the scope of that duty.  *Cf.* Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment (noting that the scope of information that should be preserved is related to whether an event provided sufficient information about the litigation).

Painadath didn't just fail to take reasonable steps to preserve the information on his phone — he affirmatively deleted a good chunk of it.  *Cf. GN Netcom, Inc. v.*

*Plantronics, Inc.*, No. 12-cv-1318, 2016 WL 3792833, at *6 (D. Del. July 12, 2006) ("[Intentionally deleting emails] is the opposite of taking reasonable steps to preserve ESI"). Painadath correctly points out that for the ESI to have been lost at all, it must have actually existed. (Pl. Resp. in Opp. to Mot. for Sanctions 17–18, ECF No. 76.) But GSPP doesn't have to prove with *absolute certainty* that the data existed or that the specific evidence it sought was on the device. The spoliation inquiry asks only whether *relevant* evidence was spoliated, and any access to the portal, regardless of whether it occurred on October 31, 2022, was relevant to this case. Painadath said that he used this phone to access the portal, admitted that he deleted data and offered no explanation for TransPerfect's conclusion that there was no evidence the iPhone had been used to access the portal. The Court thus concludes that he deleted *something* relevant, his testimony to the contrary notwithstanding. *See infra* p. 12–14 (discussing Painadath's testimony).[6]

And the ESI contained in those 31GB of erased information is "truly lost," that is, "it cannot be otherwise recovered." *Domus*, 2024 WL 3761737, at *4. Gillis told the Court that unless it has been backed up, data deleted from a phone cannot be recovered. (Sanctions H'rg Tr. at 19:11–20:3.) And when Gillis asked Painadath if he'd backed up his phone, Painadath said he hadn't. (*Id.* at 19:25–20:3.) Nor did Painadath ever represent to the Court that an alternative source of the ESI exists. That data, then, is lost, and Painadath spoliated evidence by deleting 31GB of data from his iPhone before TransPerfect could complete its inspection.

---

[6]  Whether GSPP has proven that the result of his spoliation should be to presume the information was unfavorable to him — i.e., that he accessed the portal on October 31, 2022 and downloaded the NRTS — is a separate question. *See infra* Part V.

2

The type of sanction imposed for a violation of Rule 37(e) depends on whether the movant demonstrates prejudice or intent. *See* Fed. R. Civ. P. 37(e). A party claiming prejudice must show that the spoliation "materially affected [its] substantial rights" and harmed "the presentation of [its] case" by offering "plausible, concrete suggestions" of what the missing evidence would have shown. *Bistrian*, 448 F. Supp. 3d at 477. A showing of prejudice under subdivision (e)(1) does not require a finding of intent. Nor is a finding of prejudice necessary to finding intent under subdivision (e)(2). Intent can be demonstrated by circumstantial evidence, including the timing of erasure, method of deletion, selective preservation and (non)compliance with internal policies. *Id.* at 475–76. But negligence — even gross negligence — will not suffice. *Friedman*, 2016 WL 6247470, at *8. Only if intent is proven can the court impose the severe sanctions listed in subdivision (e)(2).

Here, the prejudice to GSPP is clear. Painadath told the Court he used his iPhone to access the EEOC portal, and after he deleted data from the phone, there was no evidence he had done so. GSPP has therefore been hindered in obtaining evidence about Painadath's access to that portal, an issue crucial to its statute of limitations defense. GSPP can offer a concrete suggestion as to what that ESI would have shown: That he accessed the portal on October 31, 2022 and downloaded the NRTS. This is likely, given Painadath's testimony that he used the iPhone to access the portal and the evidence from the EEOC Activity Log that the charging party's account accessed the portal and downloaded that document on that date, (Def. Reply in Supp. of Mot. for Sanctions, Ex. 1, at 2–5, 8, ECF No. 79-2).

Moreover, GSPP has proven Painadath intended to prevent GSPP from discovering evidence that Painadath knew of his right to sue more than ninety days before he brought the Title VII claims.  He knew why the imaging process mattered. (Sanctions H'rg Tr. at 32:12–33:2; Ex. F. at 70–72.)  And he deleted a large amount of data from the phone rather than allow TransPerfect to access it.  The imaging process would have either shown that Painadath accessed the portal and downloaded the Notice, or it would show that he hadn't.  If, as he claims, the latter was true, then he had no apparent reason to delete any data.

Painadath doesn't contest that he deleted all that data from his iPhone.  He claims instead that he removed only a "device manager" related to his prior employer. (Sanctions H'rg Tr. at 40:17–42:18.)  That is not credible.  To begin, it cannot be true on these facts and circumstances that he both (1) used the device to access the portal and deleted only the device manager and (2) used the device to access the portal when there is nothing on the phone to show he did so.  *Cf.* (Ex. 2 at 29–30 (explaining what was and was not found on the iPhone); Sanctions H'rg Tr. at 18:13–20:3 (explaining that the deleted data was not and cannot now be searched).)

Nor is his account of the events surrounding the deletion credible.  Painadath claims that he was told his phone was "different."  (Sanctions H'rg Tr. at 44:7–8; Pl. Resp. at 10.)  But Gillis explained that Painadath was misrepresenting his conversations with TransPerfect.  The failed first collection attempt led to a conversation about the possible cause: TransPerfect suspected a mobile device management or other security policy was in place and raised this possibility with Painadath, who said it might be from Penn and that he'd investigate further.

(Sanctions H'rg Tr. at 46:7–12; Ex. 2 at 27–28.)  No one said that Painadath's phone was "different" or that TransPerfect couldn't acquire the data; TransPerfect frequently encounters these policies in the course of its work and simply told Painadath that the policy meant accessing the data on his phone would require a different set of tools than it otherwise would.  (Sanctions H'rg Tr. at 46:13–22; Ex. 2 at 28.)[7]  Further, Painadath said he "consult[ed] with" counsel before deleting the device manager.  (Pl. Resp. at 10; Sanctions H'rg Tr. at 44:21–23.)  After all, he "kn[e]w [his] obligation, and [he] kn[e]w [he was] in a discovery stage."  (Sanctions H'rg Tr. at 44:12–14.)  But while counsel confirmed he received an email from Painadath concerning the device manager, he denied that Painadath asked about or discussed what to do next or that counsel agreed to allow Painadath to delete anything.  (Sanctions H'rg Tr. at 45:2–11.)  Finally, Painadath's stated motive isn't credible, either.  Painadath says that his research into the device manager after he left TransPerfect led him to be concerned that the device manager could be used to remotely control his phone.  (Sanctions H'rg Tr. at 43:7–11, 44:16–20.)  Even were this fear well-founded, it reinforced the need to image the device immediately, or at least to back up his data — not to unilaterally delete anything from the device or refuse to produce the phone.[8]

---

[7]    At his deposition, Painadath stated that "[GSPP's] apps were preventing" the forensic inspection and that he looked through his phone settings "after [TransPerfect employees] shared their findings," (Pl. Dep. Day 2 at 121:18–122:3), statements that suggest he understood what TransPerfect told him yet chose to tell the Court a different story.

[8]    Painadath was not credible on many other issues as well.  For instance, he said he was told the inspection would be finished by 3:15 p.m., and yet after that time employees repeatedly provided later and later times.  (Pl. Resp. at 10.)  Yet Gillis explained that employees — in accordance with TransPerfect policy — never told Painadath when inspection would be complete and only ever provided a window within which they expected to be finished.  (Ex. 2 at 2–3.)

In light of his choice to delete over 30GB of data from the iPhone he admits he used to access the portal, and without credible evidence supporting his claim that the deleted data was irrelevant or his rationale for acting, the Court finds that Painadath's spoliation was intentional.  *Cf. Edelson*, 2017 WL 150241, at *4 (finding, based on the timing of the deletion, that a *pro se* party intentionally engaged in spoliation despite his testimony that "it didn't occur" to him that he needed to preserve emails and that he deleted them because his computer was slow).

C

1

Again, Painadath's duty to preserve relevant ESI began, at the latest, on February 13, 2023, and he was under that duty in October of 2023, when he says his MacBook stopped working. And any ESI on that MacBook concerning his use of the EEOC portal was well within the scope of that duty.

Rule 37(e) does not impose a lesser duty on *pro se* parties than on represented parties.  But courts "should be sensitive to the party's sophistication with regard to litigation in evaluating reservation efforts."  Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment.  In that spirit, *pro se* parties are sometimes treated more leniently.  *Edelson*, 2017 WL 150241, at *5 (noting, in considering Rule 37(b) sanctions, the latitude given to *pro se* complaints).

Nonetheless, *pro se* litigants "must abide by the same rules that apply to all other litigants."  *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244–45 (3d Cir. 2013) (describing the "two narrow exceptions" for *pro se* parties); *see also McDonald v. Head Criminal Court Supervisor Officer*, 850 F.2d 121, 124 (2d Cir.1988) ("When [*pro se*

16

parties] flout that obligation, they, like all litigants, must suffer the consequences of their actions.").  Backing up or copying ESI is a basic precaution, one which courts readily sanction parties for failing to undertake — even when the party is *pro se*, *see, e.g.*, *Abdelgawad v. Mangieri*, No. 14-cv-1641, 2017 WL 6557483, at *3 (W.D. Pa. 2017) (finding *pro se* defendant failed to take reasonable steps to preserve documents, "such as uploading them to a remote server or downloading them to a separated hard drive").

Painadath was not only under the general duty to preserve relevant ESI but specifically on notice that a certain category of ESI — namely, his access to the EEOC portal — was highly relevant.  As such, it was incumbent upon Painadath to preserve evidence of that his access.  Preservation of ESI means not just keeping an original device intact but taking the basic precaution of creating a copy or backup of the data contained on the device.  Painadath, by failing to back up or copy his hard drive, failed to take reasonable steps to preserve evidence relevant to this litigation.

To determine whether ESI is *truly* lost, Rule 37(e) requires an inquiry into whether the lost ESI can be restored or replaced through additional discovery.  Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment.  Efforts to restore or replace ESI should be proportional to the importance of the ESI to the claims or defenses in the case.  *Id.*  But Rule 37(e) does not require a movant to "pursue every possible avenue for replacing or restoring the ESI."  *Steves and Sons, Inc. v. JELD–WEN, Inc.*, 327 F.R.D. 96, 109 (E.D. Va. 2018).  Rather, the party must make "a good faith effort to pursue alternatives."  *Id.*  GSPP has done so.  GSPP's counsel explained that after learning that the MacBook wouldn't power on and thus the imaging could not be conducted, GSPP discussed with TransPerfect whether the data could nonetheless be

retrieved.  (Sanctions H'rg Tr. at 14:20–25.)  As Gillis then explained, although a hardware malfunction rendered the laptop inoperable, TransPerfect could send the laptop to a partner which could extract the hard drive and determine whether any data was retrievable.  (*Id.* at 21:3–21.)  But this process would come at significant cost — based on Gillis's experience, between six and twelve thousand dollars — with an uncertain outcome.  (*Id.*)  And because the cheaper alternative — attempting to fix the hardware problem — carries the risk of damaging the hard drive in the process, Gillis explained that TransPerfect doesn't recommend this option for clients interested in data preservation.  (*Id.* at 84:7–85:8.)

Although the ESI at issue is important to a key defense in this case, GSPP is not required to choose between, on the one hand, incurring significant expense for a safer retrieval option and, on the other, incurring less expense but greater risk to the very ability to retrieve the data — particularly where, in both instances, there is a possibility the data from the hard drive cannot be recovered.  (*Id.* at 21:3–2, 84:7–85:8.)[9] GSPP proved that ESI from the MacBook is lost for purposes of Rule 37(e).[10]

_____

[9]     Some courts have required parties to explore the use of forensic analysis to determine whether data is truly unrecoverable, despite the high cost.  *See, e.g., US v. Carter*, 429 F. Supp. 3d 788, 871–72 (D. Kan. 2018).  Here, however, GSPP is faced with a *pro se* party who likely cannot pay the costs of this extra discovery.  *Cf. Ellis v. PB Ventilating Sys.*, No. 23-cv-4629, 2024 WL 3025975, at *8 (E.D.N.Y. June 17, 2024) (noting the movant hadn't sought discovery from third parties and couldn't prove prejudice from the costs of this discovery because it might be entitled to reimbursement of unnecessary costs due to spoliation).  And GSPP has shown that the data may not be recoverable after all. *Cf. Paul v. Western Express, Inc.*, No. 20-cv-51, 2023 WL 2620278, at *6 (W.D. Va. March 23, 2023) (finding that the data movant sought would likely only partially exist on third-party devices and thus finding movant who had tried to obtain data via discovery requests and forensic analysis had sufficiently proven the data couldn't be restored).  The dual threat of unrecoverable expense and uncertainty convinces the Court that requiring GSPP to try to restore the ESI at issue here would improperly require it to pursue "every possible avenue."

[10]     Again, the ESI must have actually existed in order for Rule 37(e) to apply.  *Supra* p. 10.  But, as with Painadath's iPhone, GSPP has carried its burden on this issue: Painadath confirmed that the used the MacBook to access the portal, and this means that relevant evidence — even if not the evidence GSPP was hoping to find — was spoliated.  Whether GSPP has proven that the result of his

2

GSPP has, as with the iPhone, demonstrated prejudice under Rule 37(e)(1). Painadath conceded he used his MacBook to access the EEOC portal, (Sanctions H'rg Tr. at 47:8–9), but failed to preserve the device's contents, which are now lost. GSPP has been hindered in obtaining evidence about Painadath's use of that portal and particularly the timing of that use, the heart of its statute of limitations defense. GSPP offers a concrete suggestion as to what that ESI would have shown: Painadath accessed the portal on October 31, 2022 and downloaded the NRTS. This suggestion is also — given Painadath's testimony that he used the MacBook to access the portal and the evidence from the EEOC Activity Log that the charging party account accessed the portal and downloaded that document on that date, (Ex. 1 at 2–5, 8) — plausible.[11]

Unlike with his iPhone, Painadath may not have tampered with his MacBook or affirmatively deleted some of the data on it. But the circumstances lead to the conclusion that Painadath's failure to back up or copy his laptop was not merely negligent, or even grossly negligent, but instead a deliberate choice intended to prevent GSPP from obtaining discovery.[12]

---

spoliation should be to presume the information was unfavorable to him — i.e., that he accessed the portal on October 31, 2022 and downloaded the NRTS — is a separate question. *See infra* Part V.

[11]    Insofar as spoliation of the iPhone and MacBook are technically distinct violations of Rule 37(e), the existence of two devices on which the ESI might have existed threatens to make determining the prejudicial effect of either violation more difficult. There is no definitive proof as to which of the two devices was used, and although the data deletion implicates the iPhone, Painadath's testimony concerning his usual preference for viewing websites on a larger screen implicates the MacBook. (Sanctions H'rg Tr. 47:5–9.)

But the Court need not definitively determine which device Painadath used; it need only be *plausible* that each device was used to access the portal on October 31, 2022 and download the NRTS. That threshold has been met.

[12]    There is some evidence that Painadath did more than merely fail to back up or copy his hard drive. For instance, the fact that the laptop failed the same month as GSPP's motion to strike, which

Painadath has consistently stated that his MacBook died in October or November of 2023. (Sanctions Hr'g Tr. 34:12–15, 47:23–24; Pl. Resp. at 12, 13; Def. Mot. for Sanctions, Ex. K at 117, ECF No. 73-4.) GSPP's motion to strike, filed in the first week of October 2023, advanced a statute of limitations defense based on the EEOC Activity Log. (Def. Mot. to Strike at 5–6, ECF No. 40-1.) Painadath knew then, at the very latest, that his interactions with the EEOC portal using his MacBook or iPhone were very important. Yet at no point did he back up or copy his hard drive.

Once the laptop "died," Painadath left it sitting on a table for the cockroaches to inhabit. *Cf.* (Ex. 2 at 27) (noting the cockroach "raised concerns" for TransPerfect about "environmental factors affecting the device's operability"). He failed to tell his opponent, at any time before giving it to TransPerfect when ordered by the Court, that the laptop was inoperable. Not in discovery responses, email exchanges or any other interactions with counsel, or even the Court. He was instead evasive and uncooperative, making a moving target of his availability for inspection, (Ex. F at 68-75), repeatedly refusing to identify the devices he used to access the portal or to confirm that the devices he owned were the only ones he ever used for that purpose, (*id.* at 63–65, 70–72), and attempting to impose conditions on the inspection, (*id.* at 67–68, 82–83).

---

attached the Activity Log for the first time; the fact that it seems to have been kept in poor conditions; and his request for a protective order, which concerns shielding information from disclosure, while spinning an incredible theory about his laptop being surreptitiously damaged in an unrelated bank foreclosure inspection — a theory he backed away from at the hearing, (Sanctions Hr'g Tr. 89:9–14) — are suspicious. But the Court also notes that Painadath has repeatedly stated that he tried to have the laptop fixed, (Sanctions Hr'g Tr. 48:4–8; Pl. Resp. at 13), and that there is no direct evidence concerning the reason for the laptop's failure.

Viewed in its totality, Painadath's behavior with respect to the inspection of his MacBook evinces a pattern of deliberate conduct intended to delay, obfuscate and hinder counsel from obtaining the discovery to which they were entitled and which Painadath knew was important to their case. This pattern of conduct was not a series of negligent oversights but rather an intentional choice. *Cf. Reilly*, 670 F. Supp. 3d at 142 ("This is not how the discovery process is intended to work; discovery in federal court is not a game of hide the ball.") (cleaned up).

V

Having found that Painadath failed to comply with a court order in violation of Rule 37(b)(2)(A) and also spoliated evidence under Rule 37(e)(2), the Court must determine what sanctions to impose. The Court has broad discretion under Rule 37(b) when doing so, including the authority to deem a fact established for the purposes of litigation. Fed. R. Civ. P. 37(b)(2)(A). Likewise, under Rule 37(e)(2), the Court can presume that lost information was unfavorable to the spoliating party. *Id.* 37(e)(2). For the reasons below, the appropriate sanction under these circumstances is for the Court to order as established the fact that Painadath received the NRTS on October 31, 2022, when he accessed the EEOC portal and downloaded the document on that date. This fact renders the Title VII claims untimely and forms the basis for their dismissal. Circumstances make the additional imposition of monetary sanctions unjust.

A

Before granting a dismissal — or a sanction "tantamount to default judgment" — under Rule 37(b), the court must determine whether such a sanction would be justified

21

under the *Poulis* factors.  *Knoll v. City of Allentown*, 707 F.3d 406, 409 (3d Cir. 2013)

(citing *Ali v. Sims*, 788 F.2d 954, 957 (3d Cir.1986)).  The six *Poulis* factors are:

> "(1) the extent of the party's personal responsibility; (2) the prejudice to the adversary caused by the failure to meet scheduling orders and respond to discovery; (3) a history of dilatoriness; (4) whether the conduct of the party or the attorney was willful or in bad faith; (5) the effectiveness of sanctions other than dismissal, which entails an analysis of alternative sanctions; and (6) the meritoriousness of the claim or defense."

*Id.* 409 n.2 (citing *Poulis v. State Farm Fire & Casualty Co.*, 747 F.2d 863, 868 (3d Cir. 1984).[13]

1

The first *Poulis* factor weighs in favor of a dispositive sanction.  Painadath, as a *pro se* litigant, bears direct responsibility for his failure to comply with the Order and Rule 37(e).  *See Emerson v. Thiel Coll.*, 296 F.3d 184, 190 (3d Cir. 2002).  Moreover, he was notified of the possibility of sanctions in the Order.  (Order at 2.)

2

The second *Poulis* factor also favors the Court's sanction.  Prejudice to the movant is evidenced by an inability to "prepare a full and complete trial strategy."

---

[13]     Sanctions for spoliation, including those granted under Rule 37(e), are evaluated under a three-factor test. *GN Netcom, Inc. v. Plantronics*, 930 F.3d 76, 82 (3d Cir. 2019) ("(1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future.") (quoting *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3d Cir. 1994). Although the Third Circuit has not clarified whether the *Poulis* factors apply to dispositive sanctions granted under Rule 37(e), the Court will assume they do. *Cf. Bull v. United Parcel Serv.*, 665 F.3d 68, 80 (3d Cir. 2012) (analyzing the *Poulis* factors and conducting spoliation analysis when contemplating a dispositive sanction for spoliation of tangible evidence).

    Because the spoliation factors overlap with the *Poulis* factors, the Court will not analyze them separately. *Cf. Donofrio v. Ikea US Retail, LLC*, No. 18-cv-599, 2024 WL 1998094, at *23 (E.D. Pa. May 6, 2024) (focusing on the *Poulis* factors when they "largely coincide[d]" with another test for deeming facts admitted).

*Adams v. Trs. of N.J. Brewery Emps.' Pension Tr. Fund*, 29 F.3d 863, 874 (3d Cir. 1994). Prejudice can also come from "deprivation of information due to lack of cooperation with discovery" as well as the "costs of obtaining court orders to enforce discovery obligations." *Id.*

As discussed above, both of Painadath's violations of Rule 37(e) were prejudicial to GSPP because they hindered its ability to show that the Title VII claims were untimely. *Supra* pp. 12, 17.  That prejudice that also satisfies this *Poulis* factor. Painadath's violation of the Court's Order was prejudicial to GSPP for the same reasons.

3

The third *Poulis* factor weighs in favor of a dispositive sanction.  A history of dilatoriness is shown by "extensive or repeated delay or delinquency," including "consistent non-response to interrogatories, or consistent tardiness in complying with court orders." *Adams*, 29 F.3d at 874-75 (3d Cir. 1994).  "[A] party's problematic acts must be evaluated in light of [his] behavior over the life of the case." *Id.* at 875.

Painadath's dilatory conduct permeated discovery.  He baselessly objected to every interrogatory and document production request; failed to provide his signed medical authorization despite the Court's order during the Rule 16 Conference; made a moving target of his availability, refused to identify his devices and attempted to impose conditions on the inspection; failed to tell his opponent that the MacBook was worthless; took his iPhone back before the August 15th inspection could be completed; and showed up hours late on August 19th, having deleted data from the phone.

Notwithstanding the Order, Painadath's answers to GSPP's interrogatories and requests for production were woefully incomplete. *See generally* (Ex. K.). This forced counsel to try to get all of this information from Painadath at his deposition. (Sanctions H'rg Tr. at 6:10–18.) Counsel also asked Painadath to produce documents at his deposition, but they still had not been provided more than a week later. (*Id.* at 8:3–19.) The Court, once again, had to order Painadath to give counsel what he asked for. (*Id.* at 85:16–87:18.)[14]

4

The fourth *Poulis* factor also weighs in favor of a dispositive sanction. Willful conduct "involves intentional or self-serving behavior," *Adams*, 29 F.3d at 875, and can be evidenced by an "[a]bsence of reasonable excuses" or "repeated failures to observe court imposed deadlines." *Roman v. City of Reading*, 121 Fed. App'x 955, 960 (3d Cir. 2005).

Painadath's conduct was not merely dilatory, but willful. *See supra* pp. 12–14, 18–19. Painadath was well aware of the importance of producing his devices and even indicated at oral argument that he was aware of the need to avoid a spoliation motion as early as the Rule 16 conference in June. (Sanctions H'rg Tr. at 53:19–25.) Yet he refused to answer the simplest of questions on a crucial discovery matter, even after the Court ordered him to do so, and deleted data from his iPhone before counsel could

---

[14]     Moreover, the deposition was — as counsel later politely described it — "a struggle." (Sanctions H'rg Tr. at 6:19–20.) It began with Painadath's insistence that he didn't need to answer questions he believed were irrelevant. *See* (Pl. Dep. 36:6–37:20). The Court had to intervene and order Painadath to fully answer counsel's questions; even then, Painadath tried to insist that he didn't have to answer questions he considered irrelevant. *See* (Dep. Dispute Tr. at 4:4–6:8, ECF No. 86.) Throughout the remainder of the deposition, Painadath's answers were typically evasive, nonresponsive, and rambling, necessitating the extension of the deposition to a second day.

inspect it.  Painadath offered no credible excuse for this behavior.  Nor did he take reasonable steps early in the litigation to preserve the contents of a device he knew held evidence important to GSPP, *supra* p. 15, or offer a meaningful excuse for any of his other actions.[15]

5

The fifth *Poulis* factor also favors a dispositive sanction.  Indeed, a lesser sanction would not be effective or serve the purposes of Rule 37.  Painadath's conduct throughout the litigation suggests that nothing else would suffice, particularly given his *pro se* status and seemingly precarious financial state.  (Sanctions H'rg Tr. 66:3–16.) *Cf. Nieves v. Thorne*, 790 Fed. App'x 355, 358 (3d Cir. 2019) (stating that plaintiff's "*pro se* and [*in forma pauperis*] status, coupled with his refusal to comply with court orders . . . rendered [lesser] sanctions ineffective").  Furthermore, discovery has concluded, so there is no potential for similar future conduct that a lesser sanction could deter.

While serious, this sanction reflects the magnitude of Painadath's conduct: his intentional failure to comply with a Court order and intentional spoliation of crucial evidence.  And while serious, this sanction is narrowly tailored to remedy the specific harm to GSPP that resulted from Painadath's violations.  *See supra* pp. 12, 17.  As such, it is less severe than dismissal of the case in its entirety, which the Court has authority to do here.  Fed. R. Civ. P. 37(b)(2)(A)(vi)-(vi); *id.* 37(e)(2)(C).

---

[15]    Regarding Painadath's deficient responses to the interrogatories and requests for production, whatever lenience might have been afforded him as a *pro se* litigant unfamiliar with the law vanished after counsel explained the deficiencies to him and he still refused to answer.

    Painadath's excuse for his conduct at TransPerfect was also lame.  Counsel notified him that arriving before 10 a.m. would provide the best chance at receiving his devices back on the same day, and TransPerfect employees never told him the inspection would be finished at a certain time.  And his lateness is no excuse for ending the inspection to attend an appointment *four hours later*.

6

The sixth *Poulis* factor similarly reflects the importance of hearing suits on the merits.  A suit is meritorious when the allegations in the complaint would, if proven at trial, support recovery.  *Poulis*, 747 F.2d at 870.  However, where a defendant has raised *prima facie* defenses, this factor can be neutral.  *Adams*, 29 F.3d at 876–77.  Here, Painadath's Title VII claims survived a motion to dismiss, but GSPP has raised a *prima facie* defense.  Thus, this factor is neutral.  *Cf. Doss v. United States*, No. 22-cv-328, 2024 WL 759058, at *3 (W.D. Pa. Jan. 22, 2024) (finding this factor neutral where the government offered a jurisdictional statute of limitations defense).

With five factors weighing in favor of the sanction, and the remaining factor neutral, it is appropriate to establish for the purposes of this case the fact that Painadath received the NRTS on October 31, 2022, when he accessed the EEOC portal and downloaded the document.[16]

B

Rule 37(b)(2)(C) requires a court, upon finding a violation of Rule 37(b), to "order the disobedient party . . . to pay the reasonable expenses, including attorney's fees,

---

[16]     GSPP specifically asked that the Court establish as fact that Painadath used his MacBook to access the portal and download the NRTS on October 31, 2022.  At the time GSPP filed its motion, this specific request was appropriate; without confirmation that Painadath actually used his iPhone to access the portal, GSPP couldn't prove violation of any order or rule, let alone prejudice to its case.  But with Painadath's confirmation at the hearing that he used his iPhone to access the portal, the Court can conclude that he failed to comply with the Order in violation of Rule 37(b); intentionally spoliated both the iPhone and MacBook in violation of Rule 37(e)(2); and prejudiced GSPP by spoliating evidence and failing to comply with the Order.

Technically, the violation of Rule 37(b) would lead the Court to establish as fact that Painadath used his iPhone for this access; the iPhone spoliation under Rule 37(e) would lead it to presume the lost information on the iPhone was unfavorable to Painadath; and the MacBook spoliation under Rule 37(e) would lead it to presume the lost information on the MacBook was unfavorable to him.  But each of these facts leads to the same conclusion: that Painadath accessed the EEOC portal and downloaded the NRTS on October 31, 2022.

caused by the failure." Fed. R. Civ. P. 37(b)(2)(C).  However, if the Court finds "the failure was substantially justified or other circumstances make an award of expenses unjust," the sanction need not be imposed.  *Id.*

Substantial justification exists where there was a genuine dispute concerning compliance such that a reasonable person would agree that parties could differ as to whether disclosure or compliance was required.  *In re Atomica Design Group*, 591 B.R. 217, 233 (Bankr. E.D. Pa. 2018).  There is no substantial justification for Painadath's failure: the intentional deletion of data was an obvious violation of the straightforward Order, and no reasonable person could find otherwise.

Nonetheless, it would be unjust to award expenses.  *Pro se* and even indigent status do not prevent a court from imposing monetary sanctions.  *See Delay v. Dollar Energy Fund*, No. 21-cv-1037, 2023 WL 3177961, at *11 (W.D. Pa. May 1, 2023) (collecting cases).  A blanket rule against imposing monetary sanctions against indigent plaintiffs risks "incentivizing abuse of the discovery system" and evading the compensatory purpose of sanctions.  *Id.* (quotation omitted).  But, again, monetary sanctions wouldn't deter Painadath from future misconduct in this case.  And the general deterrence function of Rule 37 wouldn't be furthered by such an award.  While monetary sanctions might sometimes deter litigants in other cases from engaging in misconduct, the result in this case — dismissing all of Painadath's Title VII claims — is substantial, and the imposition of additional sanctions would not clearly add to its deterrent effect.

Moreover, the Third Circuit has encouraged courts to closely examine the circumstances "before imposing sanctions that would appear to subject a *pro se* litigant

27

to 'financial ruin.'" *Am. Bd. of Surgery, Inc. v. Lasko*, 611 Fed. App'x 69, 73 (3d Cir. 2015).  Although Painadath is not proceeding *in forma pauperis* and his conduct was serious, GSPP's costs exceed $24,000, (Def. Mot. for Sanctions 25), an amount that Painadath seems unable to pay.

In his Response, Painadath told the Court he had no money in his bank account. (Pl. Resp. at 12.)  As he is currently employed full-time, he has since received a paycheck, and testified that he makes $43.00 per hour.  (Sanctions H'rg Tr. 66:3–7.)  But he also told the Court his estimated monthly expenses are $3,000.  (Sanctions H'rg Tr. 66:14–16.)  GSPP's expenses — assuming they would not be reduced upon review — would thus amount to eight months' worth of living expenses for Painadath.  Given his financial state in comparison to GSPP's expenses, and the fact that imposing monetary sanctions would not clearly vindicate the purposes of Rule 37, the circumstances here make an expense award unjust.

## VI

Before bringing suit under Title VII, a plaintiff must first file a charge of discrimination with the EEOC.  *Hayes v. New Jersey Dep't of Hum. Servs.*, 108 F.4th 219, 221 (3d Cir. 2024).  If the EEOC decides not to pursue the charge, it notifies the plaintiff, typically via a right to sue letter.  *Id.*  The plaintiff must bring suit within ninety days of receiving that letter.  *Id.*  This ninety-day requirement is "strictly construed" and, absent "a recognized equitable consideration," cannot be extended.  *Id.* (quotations and citations omitted).

Painadath filed a charge of discrimination with the EEOC.  The EEOC notified Painadath that it would not pursue his charge via an NRTS issued on October 31, 2022.

(Ex. 1 at 3, 17.)  Because the Court takes as established the fact that Painadath received this notice that same day by accessing the EEOC portal and downloading the NRTS, he was required to assert his Title VII claims in court within ninety days of October 31, 2022.  However, Painadath first brought his Title VII claims on February 13, 2023, *see* (First Am. Compl., ECF No. 16) — 105 days after he received the NRTS.

The Court will thus dismiss all of Painadath's Title VII claims against GSPP for failure to bring suit on these claims within ninety days of receiving his NRTS.  But Painadath's case will proceed on his two remaining claims for retaliation under the Older Adult Protective Services Act and the Affordable Care Act.

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*

Gerald J. Pappert, J.

29