## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JERRY J. PAINADATH, | |
| *Plaintiff,* | CIVIL ACTION |
| v. | NO. 22-3604 |
| GOOD SHEPHERD PENN PARTNERS, | |
| *Defendant.* | |

Pappert, J.                                                            January 24, 2024

## MEMORANDUM

On September 6, 2022, *pro se* plaintiff Jerry Painadath filed this lawsuit against his former employer, Good Shepherd Penn Partners, and several of its employees. Painadath's third amended complaint alleged, against GSPP only, violations of Title VII based on sex, national origin and religion, as well as violations of the anti-retaliation provisions of the Older Adult Protective Services Act and the Affordable Care Act. The Court previously dismissed the Title VII claims. GSPP now moves for summary judgment on the two remaining retaliation claims, and the Court grants the motion.

### I

### A

### 1

GSPP is a nonprofit healthcare provider that owns and operates an acute care hospital in Philadelphia. (Moynihan Decl. ¶¶ 4–5, ECF No. 91-5.)[1] The same location

---

[1]     *See* (GSPP's Statement of Undisputed Material Facts, ECF No. 91-3.) Painadath admits most of those facts. *See* (Pl. Resp. to Statement of Undisputed Material Facts, ECF No. 93.) When

houses the Penn Institute for Rehabilitation Medicine , an inpatient rehabilitation unit of the Hospital of the University of Pennsylvania.  (*Id.* ¶ 6.)  GSPP, pursuant to an agreement with Penn Medicine, operates PIRM.  (*Id.*)

In July of 2020, Painadath began work for GSPP as a Clinical Nurse II assigned to the night shift at PIRM.  (Pl. Dep. Day 1 at 21:5–23, 30:19–32:21, ECF No. 91-6.) Painadath reported directly to Melissa Lattanzio, the Nursing Manager, who in turn reported to Natalie Blanden, the Director of Nursing, whose immediate superior was Jean Romano, the Vice President of Nursing Services and Chief Nursing Officer. (Lattanzio Decl. ¶ 4, ECF No. 91-8; Blanden Decl. ¶¶ 4–5, ECF No. 91-9; Romano Decl. ¶¶ 3–4, ECF No. 91-10.)  Throughout his employment, Painadath was subject to several employment policies, including codes of conduct and professional standards, and a performance improvement policy.  (Moynihan Decl. ¶ 7.)  Pursuant to these policies, GSPP employees were required to treat each other "with courtesy, fairness, and respect."  (Moynihan Decl. Ex. 1 at 17.[2])  GSPP's "zero tolerance" policy for workplace threats, violence and other inappropriate behavior prohibited acts of intimidation and threatening mannerisms.  (*Id.* at 28.)  Employees were cautioned that violations of this policy would result in disciplinary action, including termination.  (*Id.*)  Similarly, the PIP policy provided for progressive discipline but repeatedly noted that GSPP had the

---

he does deny a fact, he does not cite to any record evidence, and the Court accordingly deems the fact admitted.  *See* Fed. R. Civ. P. 56(c)(1), (e)(2); *James v. GEICO Ins. Co.*, No. 16-cv-2757, 2020 WL 13211638, at *1 n.1 (E.D. Pa. Dec. 18, 2020) ("[A] *pro se* plaintiff is not relieved of the obligation to set forth facts sufficient to overcome summary judgment. . . . Here, Plaintiff responded to [defendant's] Statement of Facts but provides only minimal cites to the record.  In such instances, Plaintiff submits a denial and then cites to, at best, tangential information. . . . [The Court] will only consider the facts alleged in her submission that have proper citations to the record.").

[2]    All citations to exhibit and brief page numbers refer to the ECF page number, not the document's internal pagination.

right to impose any sanction, including termination, at any point.  (*Id.* at 32–34, 36.)

Examples of behavior that could justify termination included harassment and gross

misconduct.  (*Id.* at 34–35.)

2

On June 1, 2021, Painadath emailed Sonya Wood, GSPP's Quality Assurance

Manager, to relay a concern about patient fall risks:

> I noticed during my last 5 admissions (3 African American and 2
> Caucasian) that my African American patients were not even told that
> they are fall risk, even though they were high fall risk. On the other hand
> my 2 Caucasian patients were full aware they are fall risk, and very
> effectively using call bell.
> I feel like there is variations in quality of healthcare personnel-patient
> interaction.
> Can we have a assessment tool to measure quality of healthcare
> personnel-patient interactions received in a previous setting when patient
> comes to us.

(Pl. Dep. Day 2 Ex. 7 at 23, ECF No. 91-13.)  Wood thanked Painadath for

raising the issue and asked to further discuss his thoughts regarding the assessment

tool.  (*Id.* at 24.)  Painadath explained his idea of assessing whether prior healthcare

workers had told patients that they were fall risks or taught them certain behaviors so

that GSPP "could . . . identify the barriers that prevent patient from complaint with fall

risk precautions."  (*Id.*)

3

During an August 9-10, 2021 shift, a conflict arose between Painadath and

Crystal Dunbar, a Certified Nursing Assistant.  (Pl. Dep. Day 1 at 153:19–154:8.)

Specifically, Dunbar accused Painadath of making inappropriate "Your Momma" jokes,

speaking to her aggressively and behaving in a condescending and belittling manner.

(Belton Decl. ¶ 11, ECF No. 91-11.)  She also reported that she couldn't tell if Painadath

was joking when he told her to hold a patient's penis while Painadath inserted a catheter, a task Dunbar believed was outside her normal duties.  (*Id.* ¶ 13.)  For his part, Painadath accused Dunbar of throwing an alcohol swab at him, saying "you foreigners are always late," and calling him the n-word.  (*Id.* ¶ 14.)

Andrea Tarquinio, the Assistant Nurse Manager, reported the matter to Tiana Belton, who worked for Human Resources.  (*Id.* ¶¶ 3–6 & Ex. 1 at 13.)  Belton interviewed Painadath and Dunbar along with four other GSPP employees on that shift.  (*Id.* ¶ 8.)  Although the specific accusations could not be substantiated, Belton determined that both behaved unprofessionally in a manner that "detracted from patient care" and violated GSPP's professionalism standards.  (*Id.* ¶¶ 19–20 & Ex. 2.)

Lattanzio and Blanden reviewed Belton's findings and issued written discipline to both Dunbar and Painadath.  (Lattanzio Decl. ¶ 7; Blanden Decl. ¶¶ 4–8.)  The discipline — which Dunbar, unlike Painadath, signed — held them both equally responsible and warned that future "unprofessional conduct" could result in further discipline, including termination.  (Lattanzio Decl. ¶¶ 8–10 & Ex. 2; Pl. Dep. Day 1 Ex. 14, ECF No. 91-7.)  Following this incident, Dunbar requested that she no longer be assigned to work with Painadath.  (Lattanzio Decl. ¶ 11.)  GSPP granted her request. (*Id.*)

On September 19, Lattanzio received word of another incident involving Painadath, this time with Korey Harper, a CNA with whom Painadath was assigned to work the September 18-19 shift.  (*Id.* ¶ 12.)  Lattanzio talked to Harper, who said that while he was helping another CNA care for a patient, Painadath told him to help one of their patients.  (*Id.* ¶¶ 13–14.)  When the patient told Harper he needed help being

toileted, Harper became upset with Painadath for pulling him away from a patient to do a task that Painadath could have done himself. (*Id.* ¶ 15.) When Harper said this to Painadath, Painadath became angry and called him lazy. (*Id.* ¶ 16.)

Around this time, Lattanzio was evaluating night shift employees. (*Id.* ¶ 18.) During those evaluations, she received "unsolicited feedback" from nearly every CNA and nurse with whom Painadath worked alleging that he was rude, condescending, hard to work with and "avoided providing personal hygiene and toileting patients" either on his own or when asked to help a co-worker. (*Id.* ¶ 19.) Lattanzio told Blanden and Belton of this feedback, and Blanden suggested that further discipline might be appropriate. (*Id.* ¶¶ 20–21 & Ex. 3 at 14–15.) Belton recommended they first collect further information from Painadath's co-workers to determine the details of any specific events and any impact on patient care. (*Id.* ¶ 22 & Ex. 3 at 14.)

4

During the October 9-10 shift, Painadath reported a patient fall via SafetyNet, the internal reporting system used in PIRM to report work-related patient or employee issues. (Renzi Decl. ¶ 4, ECF No. 91-14; Pl. Dep. Day 1 at 215:13–216:7; Pl. Dep. Day 1 Ex. 16.) In his report, Painadath said he found a patient on the floor, helped her into bed and examined her but found no injury. (Pl. Dep. Day 1 at 215:13–216:7; Pl. Dep. Day 1 Ex. 16.) The CNA assigned to work with Painadath that shift was Jasmine Harris. (Pl. Dep. Day 1 at 220:23–221:20.)

During the October 29-30 night shift, Painadath had another incident, this time with Harris, who was assigned to work that shift with him as well. (*Id.* at 220:6–15; Lattanzio Decl. ¶ 24.) According to Painadath, when he discovered that one of the

patients assigned to his and Harris's care needed to be changed, he left the room to find Harris. (Pl. Dep. Day 1 Ex. 22.) He told Harris, who was on her phone and failed to conduct rounds that shift, to change the patient, but she refused, walked him over to a sign outlining their responsibilities, told him this was his job and walked off the floor. (*Id.*)

Harris said she was returning from a break when Painadath walked out of a patient's room and told her to change the patient. (Belton Decl. ¶ 24(a).)[3] When she asked why he didn't do so himself, he told her that wasn't his job. (*Id.* ¶ 24(b).) After she told him that they were both responsible for this task, he raised his voice and insisted that she change the patient. (*Id.* ¶ 24(c)–(d).) Harris walked away from Painadath, but he followed her, yelling. (*Id.* ¶ 24(e).) Scared, she went to the elevators to report the incident to Susan George, the Clinical Coordinator on that shift. (*Id.* ¶¶ 22, 24(f).) Painadath followed Harris into the elevator and to George's office, though he didn't go inside. (*Id.* ¶ 24(g)–(j).) When Harris couldn't find George, she looked for the charge nurse, and Painadath continued to stare at her in the hallway. (*Id.* ¶ 24(k)–(l).) Upon finding the charge nurse, Harris began crying and recounted her interaction with Painadath. (*Id.* ¶ 24(m).)

Eventually, Harris spoke to George, who assigned another CNA to Painadath for the rest of the shift. (*Id.* ¶ 24(n)–(p).) When Harris went to give her patient reports to that CNA, Painadath interrupted them and told the CNA that Harris wasn't going anywhere. (*Id.* ¶ 24(r).) Harris then emailed Lattanzio and Blanden, describing the

---

[3]    Harris's recollection of events is detailed in a SafetyNet report and email sent during the shift, as well as a later conversation with Belton; the account in each is consistent. *See* (Renzi Decl. Ex. 1; Lattanzio Decl. Ex. 4; Belton Decl. ¶ 24.)

incident, telling them Painadath's conduct made her feel scared and unsafe. (Lattanzio Decl. Ex. 4). She also filed a SafetyNet report. (Renzi Decl. Ex. 1.)

George, meanwhile, talked to Painadath. He was upset that she had switched Harris's assignment and walked away from her while she tried to explain that both CNAs and RNs were responsible for the patient care at issue. (Blanden Decl. ¶ 26(d)–(j); Lattanzio Decl. Ex. 4.) George then emailed Lattanzio and Blanden, telling them Harris was deeply upset and Painadath was unwilling to listen to correction. (Lattanzio Decl. Ex. 4).[4]

B

1

Lattanzio sent Harris's and George's emails to Belton and discussed the reports with her. (Lattanzio Decl. ¶ 26.) Lattanzio and Blanden then decided, based on the nature of those reports, to suspend Painadath pending an investigation. (*Id.* ¶ 27; Blanden Decl. ¶ 16.) His suspension began on October 30. (Lattanzio Decl. ¶ 28; Moynihan Decl. ¶ 12; Pl Dep. Day 2 at 54:10–55:13, ECF No. 91-12.)[5]

Belton began investigating the events of October 29-30. (Belton Decl. ¶ 22.) On November 1 and 2, she interviewed Harris, George and the charge nurse who worked that shift. (Belton Decl. ¶¶ 23–26 & Ex. 3.) She also interviewed Elsen Matthew, a

---

[4]    When deposed, Painadath gave a different account of the elevator incident with Harris and his conversation with George. (Pl. Dep. Day 1 at 221:21–242:5.) According to him, after Harris refused to help, he worked on the computer for a few minutes before she ran past him to the elevator. Scared there might be an emergency, he reported the issue to George and went to the elevator to find her; Harris then followed him upstairs. When he couldn't find George, he returned to work, and she called him upstairs a few minutes later, when they discussed the incident. Painadath denied yelling at, following, or staring at Harris.

[5]    Although Painadath's suspension was initially without pay, he eventually received his regular pay for its entire duration. (Moynihan Decl. ¶ 13.)

7

Clinical Nurse II, after Matthew reported a separate incident involving Painadath that occurred in early October. (*Id.* ¶¶ 27–28 & Ex. 4.) Matthew, believing Painadath had been rude and disrespectful, had asked her supervisor to no longer assign them to work together. (*Id.* ¶ 28.)

Belton contacted Painadath to schedule an interview, (*id.* ¶ 30 & Ex. 4), but he refused to meet with her, believing that she was "hostile" to him during the August investigation, (Pl. Dep. Day 2 at 113:16–115:18). He had earlier told Lattanzio that Belton wasn't competent to conduct the investigation, (Lattanzio Decl. ¶ 29 & Ex. 5), and on November 4 he emailed Jessica Cooper, GSPP's Executive Director, requesting that a "different entity HR" conduct the investigation, or she do so herself, "because staff involved is too powerful and very influential," (Moynihan Decl. ¶ 19 & Ex. 5).

Shortly after Painadath's suspension, he had several conversations with Scott Moynihan, the Administrative Director of Human Resources, who found his behavior and statements "troubling and at times bizarre." (Moynihan Decl. ¶¶ 3, 14–17.) These interactions, combined with the nature of the allegations, caused Moynihan to worry that Painadath might pose a safety threat to fellow employees. (*Id.* ¶ 18.) Based on this concern and Painadath's doubts about GSPP's impartiality and competence, Moynihan decided to hire Lehigh Valley Paladin, LLC, a third-party firm specializing in threat assessment, to investigate both the events of October 29-30 and Painadath's interactions with co-workers more generally. (*Id.* ¶¶ 20–22.)

2

On November 11, while Painadath was suspended, he called Pennsylvania Adult Protective Services to report "a patient negligent situation at GSPP." (Pl. Dep. Day 2 at

30:7–31:7, 43:23–44:9.)  During the call, the APS representative asked Painadath patient demographic questions that he couldn't answer.  (*Id.* at 43:14–45:12.)

After calling APS, Painadath called GSPP's compliance hotline.  (*Id.* at 28:11–29:3.)  The hotline, which is run by a third party, provides GSPP written summaries of the calls it receives.  (Renzi Decl. ¶¶ 10–14.)  According to the summary of Painadath's call, he reported a patient fall in October and said he was concerned because he believed the fall was avoidable.  (*Id.* Ex. 3.)  He also reported that a patient assigned to Harris on October 29-30 "appeared to be suffering from severe neglect" and said that he had notified George and submitted a SafetyNet report about this.  (*Id.*)  Painadath told the hotline representative that GSPP policies required calling protective services when patient neglect was observed or suspected, but that he didn't have the patients' information to do so and wanted to ensure that someone from GSPP did call.  (*Id.*)

Nina Renzi, GSPP's Director of Patient Safety, Risk and Regulatory Affairs, reviewed the summary of Painadath's call the following morning, November 12.  (Renzi Decl. ¶¶ 3, 16.)  After discussing the report with others at GSPP, Renzi reported the incidents to APS that same day because Painadath believed patients had been neglected and the report didn't indicate whether Painadath had already called.  (*Id.* ¶¶ 19–21.)  Painadath claims that on November 15, he told GSPP about his APS call during a phone call with Blanden and Moynihan.  (Pl. Dep. Day 2 at 55:14–57:5; Pl. Dep. Day 2 Ex. 2 Interrog. 8.)

3

On December 5, Painadath submitted an online whistleblower complaint to the Occupational Safety and Health Administration.  (Pl. Dep. Day 2 Ex. 37.)  Painadath

stated GSPP took adverse actions against him because he reported "[c]hronic gross neglect of vulnerable and elderly black and brown patients." (*Id.*) Painadath claims he told GSPP about this complaint during a conference call with Belton, Blanden and Moynihan sometime between December 4 and 6. (Pl. Dep. Day 2 at 88:12–89:6.) GSPP maintains that it didn't know about the complaint until December 30, when Belton received an email from the Department of Labor that attached a copy of a letter sent to Painadath concerning his request for review of OSHA's dismissal of his complaint. (Belton Decl. ¶¶ 32–33 & Ex. 5.)

C

LVP finalized its report on November 29. (Moynihan Decl. Ex. 6.) Based on interviews with Painadath and a dozen other GSPP employees, LVP concluded that Painadath had consistent problems working with female co-workers, towards whom he displayed an attitude of superiority, and that multiple co-workers questioned his provision of care and were reluctant to work with him. (*Id.* at 45–47.) Based on his conduct, LVP determined that Painadath presented a "moderate potential for violence," meaning LVP could not determine the potential for violence but had sufficient basis to conclude that he knowingly inflicted emotional distress upon employees and management intervention was needed. (*Id.* at 48–49.) Moynihan was in contact with Dr. Diane Sorrentino, LVP's Director of Security and Intelligence Operations, throughout the investigation, and upon hearing the findings, he decided that termination would be an appropriate response under GSPP's policies. (Moynihan Decl. ¶¶ 24, 32–33.)

On December 8, Sorrentino met with Moynihan, Belton, Lattanzio, Blanden, Romano, Cooper and a member of GSPP's Security Department to discuss LVP's findings. (*Id.* ¶¶ 34–35.) Moynihan told Lattanzio, Blanden, Romano, and Cooper that termination would be acceptable under GSPP's policies. (*Id.* ¶ 36.) Lattanzio, Blanden and Romano then discussed the report and decided to fire Painadath. (Lattanzio Decl. ¶ 33; Blanden Decl. ¶ 20; Romano Decl. ¶ 8.) They concluded that his conduct in August and October was unprofessional, hindered patient care and intimidated his co-workers in violation of GSPP codes of conduct and professionalism. (Lattanzio Decl. ¶ 34; Blanden Decl. ¶ 21; Romano Decl. ¶ 9.) And they determined that the threat assessment from LVP and the recurrence of misconduct shortly after the August discipline meant that termination, rather than a lesser sanction, was appropriate. (Lattanzio Decl. ¶¶ 33–34; Blanden Decl. ¶¶ 20–21; Romano Decl. ¶¶ 10–11.) Painadath's termination was made effective on December 14. (Moynihan Decl. ¶ 37; Pl. Dep. Day 2 at 66:3–7.) According to his termination notice, he was fired for violating GSPP's code of conduct. (Pl. Dep. Day 2 Ex. 38.)

## II

Summary judgment is appropriate if the movant shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *Liberty Mut. Ins. Co. v. Sweeney*, 689 F.3d 288, 292 (3d Cir. 2012). To defeat a motion for summary judgment, there must be a factual dispute that is both material and genuine. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Dee v. Borough of Dunmore*, 549 F.3d 225, 229 (3d Cir. 2008). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson*, 477

U.S. at 248. A dispute over a material fact is "genuine" if, based on the evidence, "a reasonable jury could return a verdict for the nonmoving party." *Id.*

The movant bears the initial burden of demonstrating the absence of a genuine dispute of a material fact. *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016). When the movant is the defendant, they have the burden of demonstrating that the plaintiff "has failed to establish one or more essential elements of [his] case." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013). If the movant sustains their initial burden, "the burden shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At the summary judgment stage, the court's role is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249; *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007). In doing so, the court must construe the facts in the light most favorable to the non-moving party. *See Horsehead Indus., Inc. v. Paramount Commc'ns, Inc.*, 258 F.3d 132, 140 (3d Cir. 2001). But "conjecture and speculation" cannot create a genuine issue of material fact. *Wiest v. Tyco Electronics Corp.*, 812 F.3d 319, 328 (3d Cir. 2016). And the court must be mindful that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

III

A

The Older Adult Protective Services Act provides that "[a]ny person having reasonable cause to believe that an older adult is in need of protective services may report such information to the agency which is the local provider of protective services." 35 Pa. Stat. § 10225.302(a).  Anyone who makes a report or otherwise cooperates with the agency "shall be free from any discriminatory, retaliatory or disciplinary action by an employer."  *Id.* § 10225.302(c).

To prevail on his OAPSA claim, Painadath must demonstrate that (1) he engaged in a protected activity; (2) he suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse action.  *Cf. Javitz v. Luzerne Cnty.*, 293 A.3d 570, 579 (Pa. 2023).[6]  If he makes out this *prima facie* case, the burden shifts to GSPP to offer a legitimate, non-retaliatory reason for the

---

[6]     Neither the parties nor the Court are aware of judicial decisions stating the framework governing summary judgment on OAPSA retaliation claims.  Claims arising under the Pennsylvania Human Rights Act are typically analyzed in the same way as the analogous federal law.  *Renna v. PPL Electric Utilities, Inc.*, 207 A.3d 355, 367 n.16 (Superior Ct 2019).  But Painadath's claim doesn't arise under the PHRA, and the framework applicable to federal whistleblower laws differs from the *McDonnell Douglas* burden-shifting approach often applied to federal employment laws.  *See infra* Section IV.A.  By contrast, the Supreme Court of Pennsylvania has indicated that the Pennsylvania Whistleblower Law, 43 Pa. Stat. §§ 1423–28, utilizes a burden-shifting framework that looks like *McDonnell Douglas*: if an employee can show a causal connection between his protected conduct and an adverse action against him, then the employer must prove the action was taken for separate and legitimate reasons, at which point the burden shifts to the employee to prove the proffered reasons are mere pretext.  *Javitz*, 293 A.3d at 579 & n.10 (Pa. 2023) (citing *Watson v. City of Philadelphia*, 638 A.2d 489, 492 (Pa. Commw. Ct. 1994)).  The court noted the similarities between this framework and the one applied to other anti-retaliation statutes, including the PHRA and Title VII.  *Id.*; *see also id.* at 582–85 & n.20.  The Court therefore applies that framework to Painadath's OAPSA retaliation claim.  In any event, GSPP would be entitled to summary judgment under the federal whistleblower law framework as well.  *See infra* Section IV.C.

adverse action. *See id.*[7] If it does so, the burden again shifts to Painadath to demonstrate that this proffered reason is merely pretext. *Id.*

### B

Painadath fails to establish a *prima facie* case for two reasons. First, the record evidence does not show that his report to APS constituted protected activity. And second, there was no causal connection between that report and his termination.

### 1

OAPSA provides that "[a]ny person having *reasonable cause* to believe that an older adult is in need of protective services may report such information." 35 Pa. Stat. § 10225.302(a) (emphasis added). Employer retaliation against "[a]ny person making a report" is prohibited. *Id.* § 10225.302(c). Read together, these provisions make clear that OAPSA does not protect employees who make unfounded or frivolous reports, but only those who make authorized reports — that is, reports based on "reasonable cause." *Cf.* 43 Pa. Stat. §§ 1422–23 (protecting employees who report actions they have "reasonable cause to believe" constitute misconduct). A report based on reasonable cause requires, at least, an "objectively reasonable belief" that a law is implicated. *See Daniels*, 776 F.3d at 193–94 (noting this standard applies to Title VII and ADEA retaliation claims); *cf. Sukenik v. Twp. of Elizabeth*, 131 A.3d 550, 555–56 (Pa. Commw.

---

[7]     The employer's burden under the Whistleblower Law is to show that its reason is "separate and legitimate," which means the employer must show "that it would have taken the same adverse employment action absent the employee's" protected conduct. *O'Rourke v. Commonwealth*, 778 A.2d 1194, 1204 (Pa. 2001). *O'Rourke* was based on a construction of the ambiguous language of the statute and harmonization of employee and employer interests. *Id.* at 1200–04. The court also noted that whistleblower retaliation protections often impose such a burden. *Id.* at 1204 & n.12. But because *O'Rourke*'s arose out of the specific language of the statute, the Court here will not assume a break from the ordinary burden-shifting framework — which requires only a legitimate, non-retaliatory reason, *see Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 193 (3d Cir. 2015) — absent such language in OAPSA. If, however, that burden did apply, GSPP has proven that it would have terminated Painadath absent his protected conduct. *See infra* Section IV.C.

Ct. 2016) (holding the test for Whistleblower Law reports "is objective . . . an actual violation is required"). Protective services under OAPSA include resources necessary to "detect, prevent, reduce or eliminate" neglect. 35 Pa. Stat. § 10225.103. And neglect includes "the failure of a caretaker to provide goods or services essential to avoid a clear and serious threat to physical or mental health." *Id.* Painadath thus had to have an objectively reasonable belief that a patient in GSPP's care had not been provided a good or service essential to avoiding a clear and serious threat to the patient's physical or mental health.

There is no evidence reflecting the serious health threat, if any, the patients faced, the care they should have received or the nature of the alleged failures by GSPP or its employees. Painadath's internal SafetyNet reports, written at the time each incident occurred, did not mention neglect, negligence or conditions that could be characterized as such, (Pl. Dep. Day 1 Ex. 16 & 22), and neither do any other contemporaneous reports or witness statements in the record.[8]

Nor does Painadath point to any later evidence that would support the reasonableness of believing either patient suffered neglect under OAPSA. The first time the record reflects any mention of neglect with respect to the first incident is when Painadath called APS and the hotline; what exactly he told APS is unknown, but he told the hotline nothing more than that he believed the incident was avoidable. *See* (*id.* Ex. 34.) And his later deposition testimony can be understood in two ways: that he could not recall neglect having occurred at that time, or that he did not recall thinking,

---

[8]     Painadath's SafetyNet report about the second incident focuses on Harris's conduct, mentioning the patient only to say that he told Painadath he went to the bathroom. (Pl. Dep. Day 2 Ex. 22.) He does say that Harris was on her phone for hours, did not undertake the delegated task and walked off the floor. But the report never explains the patient's condition or any existing risk.

at the time of the fall, that neglect had occurred.  (*Id.* at 218:21–219:6.)  The fact that he began to rethink the first incident after the second occurred, (*id.* at 279:19–281:9), lends credence to the latter interpretation, but neither one demonstrates the necessary reasonable belief.

As for the second incident, the first evidence in the record of any mention of neglect or negligence comes from an email Painadath sent Lattanzio on November 4. *See* (Lattanzio Decl. Ex. 5.)  In that email, he characterized the investigation after October 29-30 as one into a "CNA neglecting [a] patient," but offered no account of the incident that would support characterizing it as one that rose to the level of neglect under OAPSA.  *See* (*id.*)  The first substantive record evidence concerning the patient's condition comes from Painadath's hotline call, when he said a patient was "lying in a puddle [of] urine, feces, and other bodily fluids" and "appeared to be suffering from severe neglect."  (Pl. Dep. Day 2 Ex. 37.)  But Painadath's deposition testimony, instead of expounding upon this concern, equivocates.  It is unclear whether he thinks the neglect at issue was Harris's failure to change the patient or more general lack of job training.  (Pl. Dep. Day 1 at 275:18–283:24.)  Painadath's hotline call shows the patient faced uncomfortable and unsanitary conditions, and such a condition could pose some level of risk, especially over time or for a patient who had another problem that heightened the level of risk for even short periods of time.[9]  But at summary judgment, more than "conjecture" or a "scintilla" of evidence is needed.  *See Wiest II*, 812 F.3d at 328; *Anderson*, 477 U.S. at 252.  Given the lack of record evidence concerning the health

---

[9]     Painadath was asked, at his deposition, whether he ensured the patient was changed after he couldn't find George upstairs and returned to work.  He dodged the question.  (Pl. Dep. Day 2 at 238:10–17.)

risks of such a condition, the seriousness of such risks, how long the condition lasted or any other detail about the patient and the care GSPP did or did not provide, the record evidence amounts to nothing more than Painadath's belief that Harris didn't fulfill her job responsibilities.

2

Even if a reasonable jury could find that Painadath's call to APS constituted protected activity, there is no evidence of a causal nexus between his conduct and his termination.[10]  A causal nexus between protected activity and an adverse action can be demonstrated with circumstantial evidence. *Carpenter v. William Penn Sch. Dist.*, 295 A.3d 22, 33 (Pa. Commw. Ct. 2023).   Unusually suggestive temporal proximity can be sufficient. *Daniels*, 776 F.3d at 196.  But where the timing is not itself suggestive, a plaintiff must offer other evidence, such as a pattern of antagonism, the employer's treatment of other employees, inconsistencies in its reasons for the action or any other evidence suggesting retaliation. *Id.*; *Marra v. Philadelphia Housing Auth.*, 497 F.3d 286, 302 (3d Cir. 2007).  And even where the timing of an adverse action might be unusually suggestive, other facts can sever the causal inference. *See Harrison-Harper v. Nike Inc.*, 788 Fed. App'x 846, 849–50 (3d Cir. 2019).

Painadath was fired three weeks after he told Blanden and Moynihan he called APS.  That timeframe alone, even if "unusually suggestive," isn't enough. *Id.*

---

[10]    Painadath claims that GSPP, in retaliation for his APS report, (1) removed him from the work schedule on October 30 and 31; (2) suspended him without pay during November and December; (3) instituted unwarranted investigations; (4) threatened to report him to the authorities; (5) had employees who made false accusations against him; (6) terminated him; and (7) provided negative references or interfered with his career advancement and interfered with a materially advantageous job transfer.  (Pl. Dep. Day 1 Ex. 2 Interrog. 9.)  Only the sixth action (termination) is at issue.  The first three alleged actions took place before Painadath's report and could not have been retaliatory, and there is no evidence in the record of the fourth, fifth or seventh alleged adverse actions.

17

Numerous complaints against Painadath and the resulting investigation into his misconduct predated his APS call. *See id.* at 850 (finding an employee with "a clear pattern of issues" related to her job performance could not establish causation). And of the employees involved in the decision to terminate Painadath, only two (Moynihan and Blanden) allegedly knew of his protected conduct and only one (Blanden) was involved in the ultimate decision; nothing in the record shows that Lattanzio or Romano knew about the APS call. *See id.* (finding no causal nexus where only one of four decisionmakers knew of the protected activity).

Nor is there any other evidence of retaliation, be it a pattern of antagonism against Painadath, other employees accused of similar misconduct who were not fired or inconsistent reasons for Painadath's firing.[11]

C

Even if Painadath could establish a *prima facie* case, GSPP's reason for firing him — that he violated GSPP's code of conduct, (Pl. Dep. Day 2 Ex. 38) — is a legitimate, nonretaliatory one that shifts the burden to Painadath to prove this reason is mere pretext. *See Krouse v. American Sterilizer Co.*, 126 F.3d 494, 500, 504 (noting this "relatively light" burden is satisfied by articulating any legitimate reason for the action, such as poor job performance).

---

[11]    Painadath thinks GSPP is judicially estopped from relying on his violation of GSPP policies as the reason for his termination because it didn't take that position at his unemployment benefits hearing. (Pl. Resp. in Opp. at 6–7, ECF No. 92.) To support this argument, Painadath relies on a letter from the benefits office stating that although he was discharged for violating workplace rules, he would receive benefits because GSPP "provided insufficient information to determine what rule was violated" or whether the misconduct was willful. (Pl. Supp. Statement of Undisputed Facts ¶ 18 & Ex. B-9, ECF No. 93-1.) But that letter does not say what position, if any, GSPP actually took, so there is no basis for applying judicial estoppel. *See Ryan Ops. G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 361 (3d Cir. 1996) (noting judicial estoppel "is intended to prevent parties from playing fast and loose with the courts by asserting inconsistent positions" in the same or prior litigation).

To demonstrate pretext, a plaintiff must point to evidence from which the factfinder could reasonably (1) disbelieve the employer's stated reason or (2) believe an invidious discriminatory reason was more likely than not a motivating or determinative cause of the action. *Canada v. Samuel Grossi & Sons, Inc.*, 49 F.4th 340, 347 (3d Cir. 2022) (citing *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)). This burden can be satisfied by showing that the proffered reason is weak, implausible, contradictory, or incoherent, or that the employer had previously subjected the employee to unlawful treatment or treated similarly situated persons more favorably. *Id.* Evidence of pretext can be found in an employer's motive for investigating an employee or its failure to follow internal policies. *Id.* at 348–50.

Painadath does not, and cannot, point to any evidence in the record that would allow a factfinder to reasonably conclude that GSPP's proffered reason is false, motivated by retaliation, weak or contradictory. Rather, GSPP's concern about Painadath's conduct and intention to discipline him for it predated his protected activity by months, "undermin[ing]" any claim of pretext. *See Smith v. Sec'y U.S. Navy*, 843 Fed. App'x 466, 470 (3d Cir. 2021). And Painadath points to no evidence suggesting that his protected conduct motivated GSPP to look for a reason to fire him. *See id.*; *cf. Wiest v. Tyco Electronics Corp.* (*Wiest II*), 812 F.3d 319, 333 (3d Cir. 2016) (granting summary judgment where an employee failed to identify any evidence "casting doubt on the integrity" of a misconduct investigation by connecting its initiation or result to his protected conduct).[12] Nor does the record contain any evidence that GSPP treated a

---

[12]    Painadath references his internal report of finding a vial of Naropin in a patient's room but doesn't explain why this is relevant to his retaliation claims, which are predicated on separate concerns and reports. (Pl. Resp. in Opp. at 3–4; Pl. Supp. Statement of Undisputed Facts ¶¶ 2–4). If he is trying to show GSPP viewed him as a troublemaker and thus was inclined to retaliate against

similarly situated employee more favorably, previously treated him unlawfully or failed to follow its own policies.[13]

The evidence shows that Painadath was fired after multiple reports about his rude, hostile and uncooperative conduct led to LVP's investigation, which concluded he had a serious problem working with female co-workers and posed a moderate risk for aggressive behavior or violence towards fellow employees. It is not for the Court to "second-guess" an employment decision made after "a thorough investigation." *Wiest II*, 812 F.3d at 333.

IV

A

The Affordable Care Act includes an anti-retaliation provision that prohibits employers from "discharg[ing] or in any manner discriminat[ing] against" employees who "provide[] . . . to the employer, the Federal government, or the attorney general of a State information relating to any violation of, or any act or omission the employee reasonably believes to be a violation of, any provision of [Title I of the ACA]." 29 U.S.C.

---

him, Painadath offers no evidence that GSPP reacted unfavorably to that report or that those who decided to fire him even knew about it.

[13]    GSPP had a zero-tolerance policy for threats, violence and other inappropriate behavior, including intimidation and threatening mannerisms. (Moynihan Decl. Ex. 1 at 28.) And while GSPP's PIP policy provides for progressive discipline, it also states GSPP has the right to terminate employees as its first response to misconduct and listed harassment and gross misconduct as examples of behavior that could justify termination. (*Id.* at 32–36.) And Painadath was told when previously disciplined that further misconduct could result in his termination. (Pl. Dep. Day 1 Ex. 14.)

Painadath repeatedly states he was "bullied" into performing a CNA's tasks, in violation of GSPP policies (Pl. Resp. in Opp. at 5, 8, 11–12). There is no evidence to support this or that he was required to perform tasks outside his job responsibilities or that any such policy violation was related to his firing. In fact, if he is referring to changing patients, his own testimony suggests that this is part of his responsibilities. *See* (Pl. Dep. Day 1 at 228:14–229:1.)

§ 218c(a)(2); *Stewart v. Pemberton Twp.*, No. 14-cv-6810, 2016 WL 3466103, at \*2 (D.N.J. June 23, 2016).

To prevail on his ACA retaliation claim, Painadath must show that (1) he engaged in protected activity, (2) GSPP knew or suspected that he engaged in such activity, (3) he suffered an adverse action and (4) the protected activity was a "contributing factor" in GSPP's decision to take the adverse action against him.  *See Wiest II*, 812 F.3d at 329; 15 U.S.C. §§ 2087(b)(2)(B), 2087(b)(4); *cf.* 29 C.F.R. §§ 1984.104(e), 1984.109(a).[14]  If Painadath can establish this *prima facie* case, the burden shifts to GSPP to prove by clear and convincing evidence that it would have taken the same action in the absence of the protected conduct.  *Wiest II*, 812 F.3d at 329; 15 U.S.C. § 2087(b)(4); *cf.* 29 C.F.R. §§ 1984.104(e), 1984.109(b).

B

Painadath cannot establish his *prima facie* case because he cannot show that he engaged in protected activity and, even if he can, there was no causal connection between any protected conduct and his termination.

---

[14]    The ACA anti-retaliation provision incorporates the standards created by the Consumer Product Safety Improvement Act's anti-retaliation provision.  *See* 29 U.S.C. § 218c(b)(1); 15 U.S.C. § 2087.  Under CPSIA's framework, an employee must show his protected activity was a "contributing factor" to the retaliatory action; if he does, the burden shifts to the employer to prove, by clear and convincing evidence, that it would have taken the adverse action absent the protected conduct.  *See* 15 U.S.C. § 2087(b)(2).  This framework applies to both administrative review and judicial proceedings.  *See* 15 U.S.C. § 2087(b)(4); *cf. Wiest II*, 812 F.3d at 329 n.6.
Little caselaw addresses ACA or CPSIA retaliation claims, but the statutes' anti-retaliation procedures are substantially similar to the anti-retaliation procedures provided for the Sarbanes-Oxley Act.  *See* 18 U.S.C. § 1514A(a)(1), (b); 49 U.S.C § 42121(b).  The Court therefore draws on SOX retaliation caselaw to analyze Painadath's ACA claim.  *See Lenzi v. Systemax, Inc.*, 944 F.3d 97, 114 (2d Cir. 2019) (applying the SOX framework to a CPSIA claim); *Murray v. UBS Sec., LLC*, 601 U.S. 23, 28 & n.1 (2024) (noting the anti-retaliation provision in SOX is found in many federal whistleblower statutes, including CPSIA).

21

1

An employee is protected against retaliation for reporting what he "reasonably believes" is a violation of Title I of the ACA. 29 U.S.C. § 218c(a)(2). Protected activity thus has a subjective and objective component: Painadath must "actually have believed" that the reported conduct violated the ACA and his belief must have been objectively reasonable "based on the knowledge available to a reasonable person in the same factual circumstances with the same training and experience" as Painadath. *See Wiest v. Lynch* (*Wiest I*), 710 F.3d 121, 130–31 (3d Cir. 2013) (adopting this standard for SOX retaliation claims).[15] Although the employee's belief must be objectively reasonable, it need not be correct as a matter of law; in other words, a mistaken belief can still be reasonable. *Id.* at 132.

Painadath claims two acts constitute protected conduct under the ACA: his email to Wood on June 1, 2021 and his complaint to OSHA on December 5, 2021. (Pl. Dep. Day 1 Ex. 2 Interrogs. 11–14; Pl. Dep. Day 2 at 79:9–83:24; Third Am. Compl. at ¶ 114, ECF No. 52.)[16] There is no evidence which could show that Painadath reasonably believed he was reporting a violation of the ACA either time.

---

[15]    This interpretation of the statute comes from a decision by the U.S Department of Labor Administrative Review Board to which the *Wiest* court gave *Chevron* deference. *Wiest I*, 710 F.3d at 129–132. The Court applies its holding here despite the end of *Chevron*. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024) ("By [leaving *Chevron* behind], however, we do not call into question prior cases that relied on the *Chevron* framework.").

[16]    According to Painadath's interrogatory responses, he emailed Lattanzio about "decreas[ing] near miss or actual fall incidents within black and brown patients," (Pl. Dep. Day 1 Ex. 2 Interrog. 13), but there is no evidence of any such email. And at his deposition, he confirmed that his email to Wood was the basis for his interrogatory responses concerning ACA violations. (Pl. Dep. Day 2 at 79:9–83:24.)

a

Painadath claims that he reported two ACA violations: (1) failure to implement a required fall-prevention policy and (2) race-based disparate treatment.  (Pl. Dep. Day 1 Ex. 2 Interrog. 11; Pl. Dep. Day 2 at 79:9–83:24.)  But even if Painadath subjectively believed he was reporting ACA violations in his email exchange with Wood, this belief was not objectively reasonable.  In the email, which had the subject line "Fall precaution awareness and Health equity,"  Painadath shared an observation about which of his patients were more aware of being a fall risk, expressed his belief that the quality of interactions between patients and healthcare personnel varied and accordingly requested a tool to measure the quality of these interactions prior to patients' arrival at the PIRM and "identify the barriers that prevent patient from complaint with fall risk precautions."  (Pl. Dep. Day 2 Ex. 7 at 23.)  Nowhere did Painadath state that GSPP had failed to implement an ACA-required policy or that any patients were, or had been, treated differently on the basis of race or ethnicity.  And it would not be reasonable to infer that he had: Painadath was plainly requesting a new tool he thought would improve patient care, not implementation of a policy he thought was legally required, and his observations concerning his patients were just that — observations, not accusations of disparate treatment based on race or ethnicity.  Indeed, his follow-up email, which focused on how to assess a patient's fall risk knowledge and prior care, didn't mention race or ethnicity at all.

b

On December 5, Painadath filed a complaint with OSHA claiming that GSPP took adverse actions against him for reporting "[c]hronic gross neglect of vulnerable and

elderly black and brown patients." (Pl. Dep. Day 2 Ex. 37.)[17]  The only record evidence

of any action that might constitute such a report is the email exchange with Wood, and

on December 5, the only allegedly retaliatory action he can point to is his suspension

pending the investigation into Harris's allegations from the October 29-30 shift.[18]  But

Painadath could not have reasonably believed GSPP suspended him in retaliation for

the email to Wood.  The substantial period of time between the email and his

suspension, as well as the immediate circumstances — specifically, Harris's allegations

that he made her feel unsafe by yelling at her and following her around, which came on

the heels of multiple complaints about his conduct — vitiate any retaliation claim.

2

Under the fourth element of the *prima facie* case in ACA retaliation claims, the

protected activity must be a "contributing factor" in the adverse action decision.

*Murray*, 601 U.S. at 28 & n. 1, 35–37.  But unlike in other employment contexts, the

protected activity does not need to amount to a motivating or substantial factor in the

employer's decision.  *Id.* at 36-37; *Wiest II*, 812 F.3d at 330 ("[A] contributing factor [is]

any factor, which alone or in combination with other factors, tends to affect in any way

---

[17]    The issue addressed here — whether, at the time Painadath filed his OSHA complaint, he reasonably believed that GSPP had already retaliated against him in violation of the ACA — is distinct from the question of whether GSPP later retaliated against Painadath for filing that OSHA complaint.  The latter question is addressed by the fourth element of the *prima facie* case.

[18]    Painadath's OSHA complaint listed three adverse actions: denial of benefits; harassment/intimidation; and suspension.  (Pl. Dep. Day 2 Ex. 37.)  In claiming his benefits were cancelled in retaliation for filing the OSHA complaint, Painadath points to a dental payment he made on November 19.  (Pl. Supp. Statement of Facts ¶ 13 & Ex. B-7.)  GSPP, however, produced evidence that Painadath's benefits continued throughout his suspension and were only terminated on December 31.  (Moynihan Decl. ¶ 37 & Ex. 7.)  The "scintilla" of evidence Painadath provides is not enough to create a genuine issue of material fact.  *See Anderson*, 477 U.S. at 252.  As for harassment and/or intimidation, the OSHA complaint provides no details, and here Painadath has offered no evidence of harassment, let alone any that he connects to his email to Wood.

24

the outcome of the decision.") (citation omitted).  Plaintiffs can prove this element with

a wide variety of evidence.  *See Wiest II*, 812 F.3d at 330 (holding circumstantial

evidence, including temporal proximity, can be used).

Even under this somewhat lower bar, there is no evidence in the record that

Painadath's purportedly protected conduct in any way contributed to GSPP's decision to

fire him.[19]  First, there is no evidence that Wood was involved in the decision to

terminate Painadath.  She denies it, (Wood Decl. at ¶ 5, ECF No. 91-15), and none of

those who say they were involved in the decision mention Wood or indicate they knew

about or suspected this email conversation, *see* (Lattanzio Decl. ¶¶ 33–34; Blanden

Decl. ¶¶ 20–21; Romano Decl. ¶¶ 10–11).  No reasonable jury could find that

Painadath's email was a contributing factor in the decision to fire him given the

absence of any evidence the decisionmakers knew about it.  *See Wiest II*, 812 F.3d at

332.

Second, although the short interval between GSPP's knowledge of Painadath's

OSHA complaint and the decision to terminate him might, alone, suffice to show the

complaint was a contributing factor, any causal connection based on temporal proximity

can be severed by "legitimate intervening events."  *See id.* (cleaned up).  By the time

GSPP learned of the OSHA complaint on December 5, LVP had completed its

investigative report.  Lattanzio, Blanden and Romano, who made the decision to fire

---

[19]     Painadath claims that GSPP, in retaliation for his ACA-protected conduct, (1) terminated him on December 14; (2) denied him medical benefits; (3) transferred him to a less desirable job in March 2022; (4) gave negative references for desirable jobs in 2024; and (5) interfered with his career advancement.  (Pl. Dep. Day 1 Ex. 2 Interrog. 12.)  Only the first action (termination) is at issue. Painadath cannot support the second alleged action (denial of benefits).  *See supra* note 10.  As for the third, GSPP could not have transferred Painadath three months after firing him, and he points to no evidence of the fourth or fifth alleged action.

Painadath, say they did so based on that report and Painadath's disciplinary history at GSPP. There is no evidence which could rebut or cast doubt upon these statements. *Cf. id.* (finding an investigation into ongoing misconduct, initiated and conducted months after the protected activity by individuals without knowledge of that activity, severed whatever causal connection could have existed).

C

Even if Painadath could establish his *prima facie* case, the record shows GSPP would have fired Painadath in the absence of any protected conduct. Painadath's formal disciplinary history consisted only of the August incident between him and Dunbar. But unlike Dunbar, Painadath refused to sign the written discipline he received, and following that incident, GSPP granted Dunbar's request to no longer be assigned to work with him. By mid-September, Lattanzio was notified of another problem, this time with Harper, in which Painadath was rude and unprofessional. Meanwhile, over the course of several weeks in the fall of 2021, Lattanzio received from Painadath's co-workers multiple complaints about Painadath's conduct and attitude. Then came the October 29-30 incident with Harris, after which GSPP learned that another employee, Matthew, had similarly asked to not have to work again with Painadath. Finally, LVP concluded that Painadath had serious problems working with female co-workers and posed a moderate risk for aggressive behavior or violence towards colleagues. Lattanzio, Blanden and Romano based their termination decision on LVP's report and Painadath's disciplinary history. The record establishes, by clear and convincing evidence, that GSPP would have fired Painadath notwithstanding any alleged protected conduct. *See Wiest II*, 812 F.3d at 333 (granting summary judgment

26

to an employer whose investigation found support for multiple complaints of misconduct and the employee offered no evidence "casting doubt on the integrity of the investigation").[20]

An appropriate Order follows.

BY THE COURT:


*/s/ Gerald J. Pappert*
Gerald J. Pappert, J.

---

[20]     For this reason, GSPP would be entitled to summary judgment even if Painadath's OAPSA claim was analyzed (1) precisely the way state Whistleblower Law claims are analyzed — with GSPP bearing the burden to prove, by a preponderance of the evidence, that it would have taken the same action absent the protected conduct — or (2) under the typical federal whistleblower law standard. *See supra* notes 6–7.